**RABINOVICH SOKOLOV LAW GROUP LLC**          *Attorneys for Plaintiff*
Oleg Sokolov, Esquire
Identification No. 320186
Jason Rabinovich, Esquire
Identification No. 308167
1700 Market Street, Suite 1005
Philadelphia, PA 19103
Tel: (215) 717-2200
E-mail: oleg@rslawgroup.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VELEZ ENTERPRISES LLC d/b/a OQSIE, | Civil Action No. _____ |
| *Plaintiff*, | |
| v. | |
| KVK-TECH, INC., MURTY VEPURI, and ANTHONY TABASSO, | |
| *Defendants*. | |

## COMPLAINT

Plaintiff, Velez Enterprises LLC d/b/a OQSIE (hereinafter, "OQSIE"), by and through its undersigned counsel, hereby brings this civil action against Defendants, KVK-Tech, Inc., Murty Vepuri, and Anthony Tabasso (collectively, "Defendants"), and, in support thereof, respectfully avers as follows:

### THE PARTIES

1.      Plaintiff, OQSIE, is a Delaware limited liability company with a business address of 113 Painted Trellis, Irvine, CA 92620.

2.      OQSIE provides consulting, technology solutions, and workforce solutions services to companies in the life sciences industry.

3.     Defendant, KVK-Tech, Inc. ("KVK"), is a Pennsylvania corporation with a business address of 110 Terry Drive, Newtown, PA 18940.

4.     KVK is a pharmaceutical manufacturing company.

5.     Defendant, Murty Vepuri ("Vepuri"), is an adult individual with an address of 110 Terry Drive, Newtown, PA 18940.

6.     Vepuri controls KVK through his informal role in the company.

7.     Defendant, Anthony Tabasso ("Tabasso"), is an adult individual with an address of 110 Terry Drive, Newtown, PA 18940.

8.     Tabasso is the President and CEO of KVK.

## JURISDICTION AND VENUE

9.     The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), as this action is between citizens of different States and the amount in controversy exceeds $75,000.00.

10.     The Court has personal jurisdiction over KVK, as KVK's principal place of business is in this jurisdiction and KVK regularly conducts business in this jurisdiction— including the actions which gave rise to this lawsuit.

11.     The Court has personal jurisdiction over Vepuri and Tabasso, as they are domiciled in this jurisdiction and regularly conduct business in this jurisdiction—including the actions which gave rise to this lawsuit.

12.     Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) as Defendants reside in this District and transact business in this District, and a substantial portion of OQSIE's claim arose in this District.

## FACTUAL BACKGROUND

13.     On or about February 11, 2020, Tabasso received written correspondence in the form of a Warning Letter from the U.S. Food and Drug Administration (FDA) directed to KVK (the "Warning Letter"). A true and correct copy of the Warning Letter is attached hereto as Exhibit "A".

14.     The Warning Letter summarized "significant violations of current good manufacturing practice (CGMP) regulations for finished pharmaceuticals" that were observed following the FDA's inspection of KVK's facility. Ex. A at 1.

15.     The Warning Letter strongly recommended that KVK retain a qualified third party consultant to assist in the necessary remediation, including but not limited to (1) a comprehensive investigation into the extent of the inaccuracies in data recording and reporting, (2) a current risk assessment of the potential effects of the observed failures on the quality of KVK's drugs, and (3) a management strategy for KVK that included details of KVK's global corrective action and preventative action plan. Ex. A at 5–6.

16.     Finally, the Warning Letter directed KVK to respond to the FDA in writing within fifteen working days to specify what KVK had done since the inspection to "correct [the] violations and to prevent their recurrence" and to state the reasons for delay and schedule for completion for any corrective actions that could not be completed within fifteen working days. Ex. A at 7.

17.     On February 13, 2020, OQSIE co-founder Bill Schmidt ("Schmidt") received an email from Tabasso which asked for time to discuss the ability of OQSIE to assist KVK with KVK's response to the Warning Letter.

18.     On February 14, 2020, Schmidt met with Tabasso in person, and KVK awarded OQSIE the project shortly after the meeting.

19.     Vepuri was also present at this initial meeting, and introduced himself as a consultant with PharmaTechAdvisors.

20.     Tabasso and Vepuri represented that the scope of the project would include the initial response to the Warning Letter, and development and implementation of the corrective measures necessary to correct KVK's violations and prevent their recurrence (the "Project").

21.     On February 14, 2020, following the meeting and award of the Project, Vepuri personally directed KVK's Head of Quality Assurance to give Schmidt a tour of KVK's facility.

22.     OQSIE consultants Edgardo Rivera ("Rivera"), Steve Lynn, and Steve Broadhead guided KVK's management team to prepare KVK's response to the Warning Letter, which was submitted on-time on March 4, 2020.

23.     Rivera was a consultant with OQSIE, and later left OQSIE—in violation of his contract—to join KVK as Senior Director of Corporate Quality Control.

24.     During the weeks of February 17 and February 24, 2020, KVK requested additional support from OQSIE to begin to develop protocols necessary to execute the actions that the FDA had required KVK to take pursuant to the Warning Letter.

25.     In response, OQSIE deployed three additional consultants and subject matter experts to the Project.

26.     It was during this time in mid to late February that OQSIE learned of Vepuri's role and overall position of control within KVK from consultants Rivera and Amit Patel.

27.     As the project moved forward, OQSIE consultants reported that Vepuri's statements were always the final word, and were never challenged by KVK management.

28.     OQSIE consultants further observed that it was clear that Vepuri was in charge and that Vepuri and all others at KVK behaved as if Vepuri owned KVK.

29.     On March 9, 2020, OQSIE co-founder, Jaime Velez ("Velez"), emailed a document (the "Proposal Document") to Tabasso which set forth the number of OQSIE consultants and the time that would be required to complete the commitments made by KVK to the FDA. A true and correct copy of the Proposal Document is attached hereto as Exhibit "B".

30.     The email sent to Tabasso contained bill rates for each consultant role, along with the Proposal Document referenced above.

31.     Following receipt of the Proposal Document, Tabasso gave formal approval for OQSIE to proceed. *See* Ex. B.

32.     Between March and April of 2020, OQSIE deployed consultants required to staff the teams for the Project as set forth in the Proposal Document, and the consultants began work.

33.     OQSIE and KVK held weekly governance meetings to discuss the Project.

34.     At these meetings, Vepuri always led the cost and performance discussions on behalf of KVK.

35.     OQSIE billed KVK for OQSIE's services pursuant to monthly invoices, which were issued starting in February of 2020 and due within thirty (30) days.

36.     KVK provided overwhelmingly positive feedback regarding the OQSIE consultants and their work between February and early June of 2020.

37.     In addition to this positive feedback, KVK also requested that OQSIE assist in activities and develop and deliver training to KVK staff that was outside of the scope of the Warning Letter.

38.     OQSIE implemented a performance management system to hold its consultants accountable throughout the Project, and initially shared detailed performance information of its consultants with KVK.

39.     Throughout the Project, OQSIE consultants met their timelines for deliverables—always delivering performance metrics in accordance with the twelve-month completion goal agreed to by the parties—while KVK frequently failed to meet its timeline commitments.

40.     In multiple instances, OQSIE's work was redirected directly by Vepuri.

41.     In early May of 2020, OQSIE learned that KVK was withholding payment of invoices, and that KVK was requesting significant discounts on invoices.

42.     In light of concerns regarding rates charged by OQSIE, OQSIE encouraged KVK to obtain price quotes from other qualified consulting firms.

43.     OQSIE later learned that KVK did obtain quotes from other firms, and that OQSIE's rates were lower than each of these quotes.

44.     After significant involvement by Velez, the payment issue was resolved and KVK made payments pursuant to the invoices relatively on-time through the middle of June.

45.     In early June, OQSIE delivered to KVK a comprehensive report (the "Report") of OQSIE's initial findings. This report was the result of the OQSIE consultants' review of approximately 1,000 documents across all KVK quality system components.

46.     The Report confirmed concerns expressed in the Warning Letter by the FDA regarding KVK's quality system, and also identified critical issues in areas not addressed in the Warning Letter.

47.     It was during this time—as OQSIE consultants began to communicate their concerns—that KVK's evaluation of the consultants' performance began to turn negative.

48.     It was also during this time that KVK again began withholding payment of OQSIE invoices.

49.     On June 5, 2020, Vepuri coordinated a telephone conversation with Velez wherein Vepuri referred to KVK as "his company."

50.     During all discussions between OQSIE and KVK regarding the OQSIE's findings set forth in the Report, Vepuri led the discussion for KVK.

51.     Throughout these discussions, Vepuri was consistently aggressive, abrasive, and critical.

52.     However, Vepuri was not able to provide facts or proof to substantiate his criticisms, and any challenges to Vepuri's comments typically resulted in Tabasso changing the subject.

53.     In June 2020, KVK requested that OQSIE share a proposal to remediate the gaps in KVK's quality system set forth in the Report.

54.     On July 6, 2020, OQSIE shared the proposal with KVK.

55.     OQSIE estimated that the cost to complete the remediation work within a one-year timeline would be about $10,000,000.00.

56.     Late in the evening of July 2, 2020, KVK requested that OQSIE consultants pause their activities during the week of July 6, 2020.

57.     During the week of July 6, 2020, KVK asked OQSIE consultants to pause for another week.

58.     KVK communicated its decision to terminate its use of OQSIE's services on July 16, 2020.

59.     During a telephone conversation on July 16, 2020, Tabasso committed to paying OQSIE's outstanding invoices, and confirmed he would notify the FDA that OQSIE was no longer providing support for KVK's response to the Warning Letter.

60.    Tabasso also requested that several OQSIE consultants remain available to provide support to KVK on an ad hoc basis.

61.    In early June, Rivera called Velez to communicate that Rivera had accepted a job offer from KVK.

62.    During this call, Rivera stated that Vepuri had enticed him both financially and professionally to accept the job.

63.    As of the date of this filing, KVK continues to improperly attempt to recruit additional OQSIE contractors and to entice them to terminate their business relationships with OQSIE and work directly for KVK.

64.    These attempts include, but are not limited to, Rivera contacting OQSIE contractors with specific support and contract assignments and, in at least one instance, offering a OQSIE contractor a full-time position.

65.    OQSIE only became aware of these improper recruitment attempts after they were communicated to OQSIE by the consultants who were approached.

66.    If not for KVK's improper termination of OQSIE's support, OQSIE would have made the following additional profits from its work:

      a.    Document review project – $3,000,000.00

      b.    Laboratory remediation project – $500,000.00

      c.    Data integrity project – $500,000.00

      d.    Remediation project – $3,000,000.00

67.    Instead, KVK misappropriated information and ideas obtained from OQSIE, and enticed Rivera to leave OQSIE, in order to attempt to perform the work required by the FDA.

68.     KVK continues to attempt to improperly entice additional contractors to leave OQSIE and to work directly with KVK.

69.     Upon information and belief, KVK has not completed the necessary remediation and continues to violate numerous FDA requirements.

70.     Further, on or about October 8, 2020, KVK received another warning letter from the FDA regarding KVK's Newtown, PA facility.

71.     When KVK terminated OQSIE's support, approximately $2,200,000.00 in outstanding invoices was due and owing by KVK to OQSIE. A true and correct copy of the invoice ledger as of the date of this filing is attached hereto as Exhibit "C".

72.     On August 8, 2020, Vepuri personally made a settlement offer on behalf of KVK to Velez.

73.     However, the offer was insufficient to cover the outstanding invoices, and no further offer has been put forth by KVK.

74.     As of the date of this filing, KVK has not made any payment on the outstanding invoices, despite numerous demands from OQSIE.

75.     KVK's sudden termination of OQSIE's support resulted in additional damages to OQSIE in the amount of $300,000.00—representing payroll commitments made to OQSIE consultants by OQSIE in order to ensure their availability for this project.

76.     The outstanding invoices have forced, and continue to force, OQSIE to alter its business strategy and have impacted OQSIE's ability to pursue larger projects—resulting in damages of at least $500,000.00.

77.     Additionally, as a result of KVK's conduct, OQSIE's co-founders have been forced to expend significant time and energy on this matter over the past nine months.

78.     Thus, during this time, Velez was prevented from pursuing other business opportunities, which traditionally would have resulted in new business development generating at least $1,000,000.00 in profit over the relevant time period.

79.     Finally, KVK's conduct and failure to make payments owed to OQSIE has negatively affected OQSIE's reputation with its consultants—a network of highly skilled individuals that OQSIE has spent approximately seven years developing.

80.     This negative impact on OQSIE's reputation with its consultants has resulted in additional damages to OQSIE of at least $1,000,000.00.

<u>COUNT I</u>
**BREACH OF CONTRACT**
**Plaintiff v. KVK-Tech, Inc., Murty Vepuri, and Anthony Tabasso**

81.     The preceding paragraphs are incorporated by reference, as if fully set forth at length herein.

82.     A written contract existed between OQSIE and KVK for OQSIE to support KVK in providing its initial response to the FDA's warning letter. A true and correct copy of the initial response proposal is attached hereto as Exhibit D.

83.     Additionally, an oral contract and contract implied in fact existed between OQSIE and KVK, Vepuri, and Tabasso for OQSIE to deploy its consultants and provide ongoing support for KVK's response and implementation of corrective measures as a result of the FDA's Warning Letter over the course of at least one year.

84.     In return for OQSIE's services, KVK, Vepuri, and Tabasso agreed to compensate OQSIE as set forth in the Proposal Document.

85.     The facts and surrounding circumstances as set forth in the Complaint—including but not limited to OQSIE assembling and deploying its response team—necessitate the inference of an implied contract for OQSIE to complete the Project.

86.     It is the standard and ordinary course of dealing in the consulting industry to begin work once approval to proceed is given—as opposed to drafting a full written contract—in order to respond to time sensitive matters and to allow clients to begin their initiatives quickly.

87.     In the initial February 19, 2020 email, Tabasso emphasized the importance of moving quickly on beginning this project. A true and correct copy of the February 19, 2020 email correspondence is attached hereto as Exhibit "E".

88.     Throughout the project, both Vepuri and Tabasso made personal representations and assurances to OQSIE regarding how work would be handled going forward and how payments to OQSIE would be made for OQSIE's work.

89.     KVK, Vepuri, and Tabasso breached their express and implied contract with OQSIE by (1) failing to pay for the services rendered; (2) acting in a way that interfered with the work of OQSIE consultants; (3) terminating OQSIE's support without justification before the Project was complete; and (4) improperly using OQSIE's work product, employing a OQSIE consultant, and continuing to recruit OQSIE personnel after improperly terminating OQSIE's support.

90.     OQSIE performed all of its duties pursuant to the contracts.

91.     As a result of the breach by KVK, Vepuri, and Tabasso, OQSIE suffered damages in excess of $10,000,000.00.

WHEREFORE, OQSIE respectfully requests that the Court enter judgment in its favor and against KVK, Vepuri, and Tabasso, together with consequential damages, interest, court costs, attorney's fees, and any other such relief the Court finds just and proper.

## COUNT II
## UNJUST ENRICHMENT
### Plaintiff v. KVK-Tech, Inc., Murty Vepuri, and Anthony Tabasso

92.     The preceding paragraphs are incorporated by reference, as if fully set forth at length herein.

93.     OQSIE conferred benefits upon KVK, Vepuri, and Tabasso in the form of OQSIE's consulting and remediation services for the Project as set forth above.

94.     KVK, Vepuri, and Tabasso appreciated these benefits by enjoying OQSIE's services and support, by reporting to the FDA that OQSIE was providing support for KVK's response to the Warning Letter, and by continuing to wrongfully use OQSIE's work product and personnel even after terminating the relationship with OQSIE.

95.     KVK has outstanding invoices exceeding $2,200,000.00 for work that OQSIE has already performed and that KVK had committed to paying.

96.     KVK also continues to benefit from OQSIE's services—by retaining OQSIE's work product and by wrongfully inducing Rivera to leave OQSIE—despite refusing to allow OQSIE to complete the Project that OQSIE was initially awarded by KVK.

97.     Under the circumstances as set forth in this Complaint, it would be inequitable for KVK, Vepuri, and Tabasso to retain the benefits conferred on them by OQSIE without payment of value.

WHEREFORE, OQSIE respectfully requests that the Court enter judgment in its favor and against KVK, Vepuri, and Tabasso, together with consequential damages, interest, court costs, attorney's fees, and any other such relief the Court finds just and proper.

**COUNT III**
**FRAUD**
**Plaintiff v. KVK-Tech, Inc., Murty Vepuri, and Anthony Tabasso**

98.     The preceding paragraphs are incorporated by reference, as if fully set forth at length herein.

99.     In February 2020, KVK, Vepuri, and Tabasso represented that they wished to engage OQSIE's services to respond to the Warning Letter KVK received from the FDA and to develop and implement the corrective measures necessary to correct KVK's violations and prevent their recurrence.

100.     Tabasso, through email communication on February 13, 2020 and February 19, 2020, represented that KVK and OQSIE would need to move quickly to provide an initial response to the Warning Letter. *See* Ex. E.

101.     Vepuri initially represented to OQSIE that his role was as a consultant with PharmaTechAdvisors.

102.     KVK, through Tabasso, represented that it desired that OQSIE move forward with deploying consultants to complete the work necessary following the initial response to the Warning Letter. *See* Ex. B.

103.     These representations were material to the transaction at hand and to OQSIE deciding to take the project with KVK and to deploy significant resources to support KVK's response to the Warning Letter.

104.    KVK, Vepuri, and Tabasso made these statements with knowledge and/or recklessness as to their falsity—knowing (1) that KVK did not intend to use OQSIE's support for KVK's full development and implementation of the corrective measures, (2) that KVK would not comply with the hourly rates for OQSIE consultants communicated by OQSIE, and (3) that Vepuri was not simply a consultant and instead was and is the de-facto owner of KVK.

105.    The representations were made with the intent of inducing OQSIE to rely upon them and to provide initial support and resources for KVK's response.

106.    OQSIE's reliance was justified, as it had no reason to believe that KVK, Vepuri, and Tabasso would not act professionally and honor their commitments.

107.    But for the misrepresentations of KVK, Vepuri, and Tabasso, OQSIE would not have agreed to provide any services to KVK.

108.     As a proximate cause of the misrepresentations of KVK, Vepuri, and Tabasso, OQSIE suffered damages in excess of $10,000,000.00.

WHEREFORE, OQSIE respectfully requests that the Court enter judgment in its favor and against KVK, Vepuri, and Tabasso, together with consequential damages, punitive damages, interest, court costs, attorney's fees, and any other such relief the Court finds just and proper.

### COUNT IV
**TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP**
**Plaintiff v. KVK-Tech, Inc., Murty Vepuri, and Anthony Tabasso**

109.    The preceding paragraphs are incorporated by reference, as if fully set forth at length herein.

110.    From March 2017 through June 2020, an ongoing economic business relationship existed between OQSIE and Rivera.

111.    Additionally, at the time Rivera left OQSIE to accept a job with KVK, a contractual relationship existed between OQSIE and Rivera with regards to the KVK Project.

112.    KVK, through the personal representations and enticements of Vepuri and Tabasso, acted to convince Rivera to end his relationship with OQSIE and to accept a position with KVK.

113.    KVK, Vepuri, and Tabasso, intended to cause harm to OQSIE by inducing Rivera to terminate his contractual and business relationship with OQSIE and to accept a position with and perform services for KVK using knowledge, expertise, and information that Rivera had obtained through his work with OQSIE and on the Project.

114.    KVK, Vepuri, and Tabasso continue their attempt to cause harm to OQSIE by improperly seeking to recruit additional OQSIE contractors and attempting to convince them to terminate their business relationships with OQSIE and work directly for KVK.

115.    No privilege or justification existed that could have allowed KVK, Vepuri, and Tabasso to interfere in the relationship between OQSIE and Rivera.

116.    No privilege or justification existed that could allow KVK, Vepuri, and Tabasso to interfere in OQSIE's relationship with its other contractors.

117.    As a result of the conduct of KVK, Vepuri, and Tabasso, OQSIE suffered damages in excess of $10,000,000.00.

118.    Additionally, the intentional wrongful conduct, dishonestly, and lack of business ethics displayed by KVK, Vepuri, and Tabasso in this matter serves as grounds for punitive damages.

WHEREFORE, OQSIE respectfully requests that the Court enter judgment in its favor and against KVK, Vepuri, and Tabasso, together with consequential damages, punitive damages, interest, court costs, attorney's fees, and any other such relief the Court finds just and proper.

## **CONCLUSION**

WHEREFORE, OQSIE respectfully requests that the Court enter judgment in its favor and against Defendants, KVK, Murty Vepuri, and Anthony Tabasso, jointly and severally, together with consequential damages, punitive damages, interest, court costs, attorney's fees, and any other such relief the Court finds just and proper.

RESPECTFULLY SUBMITTED,
**Rabinovich Sokolov Law Group LLC**

BY: _____
Oleg Sokolov, Esquire
*Attorney for Plaintiff*

Dated:  November 6, 2020