**RABINOVICH SOKOLOV LAW GROUP LLC**          *Attorneys for Plaintiff*
Oleg Sokolov, Esquire
Identification No. 320186
Jason Rabinovich, Esquire
Identification No. 308167
1700 Market Street, Suite 1005
Philadelphia, PA 19103
Tel: (215) 717-2200
E-mail: oleg@rslawgroup.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VELEZ ENTERPRISES LLC d/b/a OQSIE,<br><br>*Plaintiff*,<br><br>v.<br><br>KVK-TECH, INC., MURTY VEPURI, and ANTHONY TABASSO,<br><br>*Defendants*. | Civil Action No. 2:20-cv-05553-MMB |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff, Velez Enterprises LLC d/b/a OQSIE (hereinafter, "OQSIE"), by and through its undersigned counsel, hereby brings this civil action against Defendants, KVK-Tech, Inc., Murty Vepuri, and Anthony Tabasso (collectively, "Defendants") and files its First Amended Complaint, and, in support thereof, respectfully avers as follows:

### THE PARTIES

1.      Plaintiff, OQSIE, is a Delaware limited liability company with a business address of 113 Painted Trellis, Irvine, CA 92620.

2.      OQSIE provides consulting, technology solutions, and workforce solutions services to companies in the life sciences industry.

3.      OQSIE's members are Jaime Velez ("Velez") and Bill Schmidt ("Schmidt").

4.      Velez is an adult individual and a citizen of California, with an address of 5602 Heritage Oak Dr., Trabuco Canyon, CA 92679.

5.      Schmidt is an adult individual and a citizen of Florida, with an address of 10406 Paradise Bay Ct., Clermont, FL 34711.

6.      Defendant, KVK-Tech, Inc. ("KVK"), is a Pennsylvania corporation with a business address of 110 Terry Drive, Newtown, PA 18940.

7.      KVK is a pharmaceutical manufacturing company.

8.      Defendant, Murty Vepuri ("Vepuri"), is an adult individual with an address of 110 Terry Drive, Newtown, PA 18940.

9.      Vepuri controls KVK through his informal role in the company.

10.     Defendant, Anthony Tabasso ("Tabasso"), is an adult individual with an address of 110 Terry Drive, Newtown, PA 18940.

11.     Tabasso is the President and CEO of KVK.

## JURISDICTION AND VENUE

12.     The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), as this action is between citizens of different States and the amount in controversy exceeds $75,000.00.

13.      The Court has personal jurisdiction over KVK, as KVK's principal place of business is in this jurisdiction and KVK regularly conducts business in this jurisdiction—including the actions which gave rise to this lawsuit.

14.     The Court has personal jurisdiction over Vepuri and Tabasso, as they are domiciled in this jurisdiction and regularly conduct business in this jurisdiction—including the actions which gave rise to this lawsuit.

15.     Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) as Defendants reside in this District and transact business in this District, and a substantial portion of OQSIE's claim arose in this District.

## FACTUAL BACKGROUND

16.     On or about February 11, 2020, Tabasso received written correspondence in the form of a Warning Letter from the U.S. Food and Drug Administration (FDA) directed to KVK (the "Warning Letter"). A true and correct copy of the Warning Letter is attached hereto as Exhibit "A".

17.     The Warning Letter summarized "significant violations of current good manufacturing practice (CGMP) regulations for finished pharmaceuticals" that were observed following the FDA's inspection of KVK's facility. Ex. A at 1.

18.     The Warning Letter strongly recommended that KVK retain a qualified third party consultant to assist in the necessary remediation, including but not limited to (1) a comprehensive investigation into the extent of the inaccuracies in data recording and reporting, (2) a current risk assessment of the potential effects of the observed failures on the quality of KVK's drugs, and (3) a management strategy for KVK that included details of KVK's global corrective action and preventative action plan. Ex. A at 5–6.

19.     Finally, the Warning Letter directed KVK to respond to the FDA in writing within fifteen working days to specify what KVK had done since the inspection to "correct [the] violations and to prevent their recurrence" and to state the reasons for delay and schedule for completion for any corrective actions that could not be completed within fifteen working days. Ex. A at 7.

20.     On February 13, 2020, Schmidt received an email from Tabasso, where Tabasso asked for time to discuss the ability of OQSIE to assist with KVK's response to the Warning Letter.

21.     On February 14, 2020, Schmidt met with Tabasso in person, and KVK awarded OQSIE the project shortly after the meeting.

22.     Vepuri was also present at this initial meeting, and introduced himself as a consultant with PharmaTechAdvisors.

23.     Tabasso and Vepuri represented that the scope of the project would include the initial response to the Warning Letter, and development and implementation of the corrective measures necessary to correct KVK's violations and prevent their recurrence (the "Project").

24.     On February 14, 2020, following the meeting and award of the Project, Vepuri personally directed KVK's Head of Quality Assurance to give Schmidt a tour of KVK's facility.

25.     On February 15, 2020, OQSIE sent KVK a Proposal to Support Warning Letter Response and Remediation Planning. A true and correct copy of the February 15, 2020 proposal is attached hereto as Exhibit "B".

26.     The February 15, 2020 proposal outlined OQSIE's initial support plan, broken out into two approximately three-week long phases: Phase I focused on the response to the Warning Letter, and Phase II focused on developing remediation execution and resource plans. Ex. B at 2.

27.     Tabasso accepted the proposal on behalf of KVK on February 17, 2020. Ex. B at 4.

28.     Thereafter, OQSIE consultants Edgardo Rivera ("Rivera"), Steve Lynn, and Steve Broadhead guided KVK's management team to prepare KVK's response to the Warning Letter, which was submitted on-time on March 4, 2020.

29.     Rivera was a consultant with OQSIE, and later left OQSIE—in violation of his contract—to join KVK as Senior Director of Corporate Quality Control.

30.     During the weeks of February 17 and February 24, 2020, KVK requested additional support from OQSIE to begin to develop protocols necessary to execute the actions that the FDA had required KVK to take pursuant to the Warning Letter.

31.     In response, OQSIE deployed three additional consultants and subject matter experts to the Project.

32.     The additional support and deployment of additional consultants expanded OQSIE's work beyond the scope of the initial February 15, 2020 proposal.

33.     It was during this time in mid to late February that OQSIE learned of Vepuri's role and overall position of control within KVK from consultants Rivera and Amit Patel.

34.     As the Project moved forward, OQSIE consultants reported that Vepuri's statements were always the final word, and were never challenged by KVK management.

35.     OQSIE consultants further observed that it was clear that Vepuri was in charge and that Vepuri and all others at KVK behaved as if Vepuri owned KVK.

36.     On March 9, 2020, Velez emailed a document to Tabasso which set forth the number of OQSIE consultants and the time that would be required to complete the commitments made by KVK to the FDA. A true and correct copy of the March 9, 2020 support plan is attached hereto as Exhibit "C".

37.     The email sent to Tabasso contained bill rates for each consultant role, along with the support plan document referenced above.

38.     Tabasso confirmed KVK's acceptance of the March 9, 2020 support plan and gave formal approval for OQSIE to proceed on March 9, 2020. *See* Ex. C.

39.    Between March and April of 2020, OQSIE deployed consultants required to staff the teams for the Project as set forth in the support plan, and the consultants began work.

40.    OQSIE and KVK held weekly governance meetings to discuss the Project.

41.    At these meetings, Vepuri always led the cost and performance discussions, purportedly on behalf of KVK.

42.    OQSIE billed KVK for OQSIE's services pursuant to weekly invoices, which were issued starting in February of 2020 and due within thirty (30) days.

43.    In May 2020, OQSIE requested that KVK execute a consulting services agreement. Tabasso stated on several occasions that he would look into this; however, Tabasso, Vepuri, and KVK ultimately failed to execute the services agreement.

44.    Initially, KVK paid the invoices pursuant to the parties' agreement—paying more than $2,000,000.00 in invoices issued by OQSIE to KVK for support of the activities KVK committed to the FDA.

45.    KVK provided overwhelmingly positive feedback regarding the OQSIE consultants and their work between February and early June of 2020.

46.    In addition to this positive feedback, KVK also requested that OQSIE assist in activities and develop and deliver training to KVK staff that was outside of the scope of the Warning Letter.

47.    OQSIE implemented a performance management system to hold its consultants accountable throughout the Project, and initially shared detailed performance information of its consultants with KVK.

48.    Throughout the Project, OQSIE consultants met their timelines for deliverables— always delivering performance metrics in accordance with the twelve-month completion goal agreed to by the parties—while KVK frequently failed to meet its timeline commitments.

49.     In multiple instances, OQSIE's work was redirected directly by Vepuri.

50.     In early May of 2020, OQSIE learned that KVK was withholding payment of invoices, and that KVK was requesting significant discounts on invoices.

51.     In light of concerns regarding rates charged by OQSIE, OQSIE encouraged KVK to obtain price quotes from other qualified consulting firms.

52.     OQSIE later learned that KVK did obtain quotes from other firms, and that OQSIE's rates were lower than each of these quotes.

53.     After significant involvement by Velez—which took time and resources away from OQSIE's other projects and potential projects—the payment issue was momentarily resolved and KVK made payments pursuant to the invoices relatively on-time through May and into June.

54.     In early June 2020, OQSIE delivered to KVK a comprehensive report (the "Report") of OQSIE's initial findings. This report was the result of the OQSIE consultants' review of approximately 1,000 documents across all KVK quality system components.

55.     The Report confirmed concerns expressed in the Warning Letter by the FDA regarding KVK's quality system, and also identified critical issues in areas not addressed in the Warning Letter.

56.     It was during this time—as OQSIE consultants began to communicate their concerns—that KVK's evaluation of the consultants' performance began to turn negative.

57.     It was also during this time that KVK again began withholding payment of OQSIE invoices.

58.     On June 5, 2020, Vepuri coordinated a telephone conversation with Velez wherein Vepuri referred to KVK as "his company."

59.     During all discussions between OQSIE and KVK regarding the OQSIE's findings set forth in the Report, Vepuri led the discussion for KVK.

60.     Throughout these discussions, Vepuri was consistently aggressive, abrasive, and critical.

61.     However, Vepuri was not able to provide facts or proof to substantiate his criticisms, and any challenges to Vepuri's comments typically resulted in Tabasso changing the subject.

62.     In June 2020, KVK requested that OQSIE share a proposal to remediate the gaps in KVK's quality system set forth in the Report.

63.     On July 6, 2020, OQSIE shared the proposal with KVK.

64.     OQSIE estimated that the cost to complete the remediation work within a one-year timeline would be about $10,000,000.00.

65.     Late in the evening of July 2, 2020, KVK requested that OQSIE consultants pause their activities during the week of July 6, 2020.

66.     During the week of July 6, 2020, KVK asked OQSIE consultants to pause for another week.

67.     KVK communicated its decision to terminate its use of OQSIE's services on July 16, 2020.

68.     During a telephone conversation on July 16, 2020, Tabasso committed to paying OQSIE's outstanding invoices, and confirmed he would notify the FDA that OQSIE was no longer providing support for KVK's response to the Warning Letter.

69.     Tabasso also requested that several OQSIE consultants remain available to provide support to KVK on an ad hoc basis.

70.     KVK's commitments to OQSIE during the July 16, 2020 telephone conversation are summarized in a July 21, 2020 email from Velez to Tabasso, attached hereto as Exhibit "D".

71.     In early June, Rivera called Velez to communicate that Rivera had accepted a job offer from KVK.

72.     During this call, Rivera stated that Vepuri had enticed him both financially and professionally to accept the job.

73.     As of the date of this filing, KVK continues to improperly attempt to recruit additional OQSIE contractors and to entice them to terminate their business relationships with OQSIE and work directly for KVK.

74.     If not for KVK's improper termination of OQSIE's support, OQSIE would have made the following additional profits from its work:

    a.   Document review project – $3,000,000.00

    b.   Laboratory remediation project – $500,000.00

    c.   Data integrity project – $500,000.00

    d.   Remediation project – $3,000,000.00

75.     Instead, KVK misappropriated information and ideas obtained from OQSIE, and enticed Rivera to leave OQSIE, in order to attempt to perform the work required by the FDA.

76.     Upon information and belief, KVK has not completed the necessary remediation and continues to violate numerous FDA requirements.

77.     Further, on or about October 8, 2020, KVK received another warning letter from the FDA regarding KVK's Newtown, PA facility.

78.     When KVK terminated OQSIE's support, approximately $2,200,000.00 in outstanding invoices was due and owing by KVK to OQSIE, which Tabasso committed to

paying. A true and correct copy of the invoice ledger as of the date of this filing is attached

hereto as Exhibit "E".

79.     On August 8, 2020, Vepuri personally made a settlement offer on behalf of KVK

to Velez.

80.     However, the offer only satisfied a fraction of the outstanding invoices, and no

further offer has been put forth by KVK.

81.     After factoring in interest and late payment fees, the total outstanding amount due

to OQSIE from KVK now exceeds $3,000,000.00.

82.     Ultimately, in June 2021, KVK, Vepuri, and Ashvin Panchal were charged with

conspiracy to defraud the FDA. A true and correct copy of the press release is attached hereto as

Exhibit "F".

83.     The indictment reaffirmed the fact that Vepuri acted as de facto owner of KVK

despite his representations to the contrary, directed KVK's operations and made all key business

decisions of the company, personally profited from KVK's business activities, and exercised

unchecked authority over the company. Ex. F at 1–2.

84.     As of the date of this filing, KVK has not made any payment on the outstanding

invoices, despite numerous demands from OQSIE.

85.     KVK's sudden termination of OQSIE's support resulted in additional damages to

OQSIE in the amount of $300,000.00—representing payroll commitments made to OQSIE

consultants by OQSIE in order to ensure their availability for this project.

86.     The outstanding invoices have forced, and continue to force, OQSIE to alter its

business strategy and have impacted OQSIE's ability to pursue larger projects—resulting in

damages of at least $500,000.00.

87.     Additionally, as a result of KVK's conduct, OQSIE's owners have been forced to expend significant time and energy on this matter.

88.     Thus, during this time, Velez was prevented from pursuing other business opportunities, which traditionally would have resulted in new business development generating at least $1,000,000.00 in profit over the relevant time period.

89.     Finally, KVK's conduct and failure to make payments owed to OQSIE has negatively affected OQSIE's reputation with its consultants—a network of highly skilled individuals that OQSIE has spent approximately seven years developing.

90.     This negative impact on OQSIE's reputation with its consultants has resulted in additional damages to OQSIE of at least $1,000,000.00.

**COUNT I**
**BREACH OF CONTRACT**
**Plaintiff v. KVK-Tech, Inc.**

91.     The preceding paragraphs are incorporated by reference, as if fully set forth at length herein.

92.     On February 17, 2020 OQSIE and KVK entered into a written contract for OQSIE to support KVK in providing its initial response to the FDA's Warning Letter, and to develop remediation execution and resource plans. Ex. B.

93.     In return for OQSIE's services, KVK agreed to compensate OQSIE as set forth in the support plan emailed to Tabasso on March 9, 2020. Ex. C.

94.     KVK, breached the written contract with OQSIE by (1) failing to pay for the services rendered; (2) acting in a way that interfered with the work of OQSIE consultants; (3) terminating OQSIE's support without justification before the Project was complete; and (4) improperly using OQSIE's work product, employing a OQSIE consultant, and continuing to recruit OQSIE personnel after improperly terminating OQSIE's support.

95.     OQSIE performed all of its duties pursuant to the contracts.

96.     As a result of the breach by KVK, Vepuri, and Tabasso, OQSIE suffered damages

in excess of $10,000,000.00.

WHEREFORE, OQSIE respectfully requests that the Court enter judgment in its favor

and against KVK, together with consequential damages, interest, court costs, attorney's fees, and

any other such relief the Court finds just and proper.

## COUNT II
## BREACH OF CONTRACT
### Plaintiff v. KVK-Tech, Inc.

97.     The preceding paragraphs are incorporated by reference, as if fully set forth at

length herein.

98.     An oral contract exists between OQSIE and KVK wherein Tabasso, on behalf of

KVK, committed to paying the outstanding invoices sent from OQSIE to KVK, which at the

time totaled more than $2,000,000.00, and now—factoring in interest and late payment fees, total

more than $3,000,00.00.

99.     This agreement was reached on July 16, 2020 during a phone conversation

between Velez and Tabasso.

100.    Vepuri and another KVK representative were also present on the July 16 call, and

did not voice any disagreement with Tabasso's commitment to pay the outstanding invoices.

101.    Velez summarized the parties' agreement in an email sent from Velez to Tabasso

on July 21, 2020. Ex. D.

102.    KVK breached the oral agreement by failing to pay the outstanding invoices.

103.    OQSIE performed all of its duties pursuant to the agreement.

104.    As a result of KVK's breach of the oral agreement, OQSIE suffered damages in

excess of $3,000,000.00.

12

WHEREFORE, OQSIE respectfully requests that the Court enter judgment in its favor and against KVK, together with consequential damages, interest, court costs, attorney's fees, and any other such relief the Court finds just and proper.

## COUNT III
### UNJUST ENRICHMENT
**Plaintiff v. Murty Vepuri, and Anthony Tabasso**

105.     The preceding paragraphs are incorporated by reference, as if fully set forth at length herein.

106.     OQSIE conferred benefits upon KVK, Vepuri, and Tabasso in the form of OQSIE's consulting and remediation services for the Project as set forth above.

107.     KVK, Vepuri, and Tabasso appreciated these benefits by receiving OQSIE's services and support, by enjoying increased profits as a result of OQSIE's services, by reporting to the FDA that OQSIE was providing support for KVK's response to the Warning Letter, and by continuing to wrongfully use OQSIE's work product and personnel even after terminating the relationship with OQSIE.

108.     Vepuri and Tabasso personally benefited from OQSIE's services as a result of being personally compensated based upon KVK's profits—which were increased as a result of OQSIE's services.

109.     Vepuri also personally benefited by hiding his involvement in KVK by placing its ownership in private trusts for the benefit of his children. *See* Ex. F at 2.

110.     Neither KVK, Vepuri, or Tabasso properly compensated OQSIE for its services—instead seeking to enjoy the benefits of work that was not paid for.

111.     KVK has outstanding invoices exceeding $3,000,000.00 for work that OQSIE has already performed and that KVK, through Tabasso and with Vepuri's agreement, committed to paying.

112.     Under the circumstances as set forth in this Complaint, it would be inequitable for Vepuri and Tabasso to retain the benefits conferred on them by OQSIE without payment of value for OQSIE's services.

WHEREFORE, OQSIE respectfully requests that the Court enter judgment in its favor and against Vepuri and Tabasso, together with consequential damages, interest, court costs, attorney's fees, and any other such relief the Court finds just and proper.

**COUNT IV**
**UNJUST ENRICHMENT**
**Plaintiff v. KVK-Tech, Inc.**

113.     The preceding paragraphs are incorporated by reference, as if fully set forth at length herein.

114.     OQSIE conferred benefits upon KVK in the form of OQSIE's consulting and remediation services for the Project as set forth above.

115.     KVK, along with Vepuri and Tabasso, appreciated these benefits by receiving OQSIE's services and support, by enjoying increased profits as a result of OQSIE's services, by reporting to the FDA that OQSIE was providing support for KVK's response to the Warning Letter, and by continuing to wrongfully use OQSIE's work product and personnel even after terminating the relationship with OQSIE.

116.     Neither KVK, Vepuri, or Tabasso properly compensated OQSIE for its services— instead seeking to enjoy the benefits of work that was not paid for.

117.     KVK has outstanding invoices exceeding $3,000,000.00 for work that OQSIE has already performed and that KVK, through Tabasso and with Vepuri's agreement, committed to paying.

118.     Under the circumstances as set forth in this Complaint, if it is found that no contract existed between OQSIE and KVK for payment of these invoice, then, in the alternative,

it would be inequitable for KVK to retain the benefits conferred on them by OQSIE without payment of value for OQSIE's services.

WHEREFORE, OQSIE respectfully requests that the Court enter judgment in its favor and against KVK, together with consequential damages, interest, court costs, attorney's fees, and any other such relief the Court finds just and proper.

## CONCLUSION

WHEREFORE, OQSIE respectfully requests that the Court enter judgment in its favor and against Defendants, KVK, Murty Vepuri, and Anthony Tabasso, jointly and severally, together with consequential damages, interest, court costs, attorney's fees, and any other such relief the Court finds just and proper.

RESPECTFULLY SUBMITTED,
**Rabinovich Sokolov Law Group LLC**

BY: _____
Oleg Sokolov, Esquire
*Attorney for Plaintiff*

Dated:  October 6, 2021

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I did cause a true and correct copy of Plaintiff's Amended Complaint

to be sent via the Court's ECF system to all counsel of record on or about the date indicated

below.

**Rabinovich Sokolov Law Group LLC**

BY: /s/ Oleg Sokolov
Oleg Sokolov, Esquire
*Attorney for Plaintiff*

Dated:  October 6, 2021