**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **VELEZ ENTERPRISES LLC d/b/a OQSIE**<br><br>**v.**<br><br>**KVK-TECH, INC., MURTY VEPURI, and ANTHONY TABASSO** | **CIVIL ACTION**<br><br>**NO. 20-5553** |

<u>**MEMORANDUM RE: PARTIAL MOTIONS FOR SUMMARY JUDGMENT**</u>

Baylson, J.                                                                                           June 27, 2024

      This case involves Plaintiff Velez Enterprises LLC's breach of contract and unjust enrichment claims against Defendants KVK-Tech, Inc. ("KVK"), Murty Vepuri, and Anthony Tabasso. Plaintiff alleges that Defendants failed to pay roughly $1.9 million in consulting fees associated with Defendants' efforts to remediate several compliance violations raised by the Food and Drug Administration ("FDA"). Presently before this Court are the Parties' cross-motions for partial summary judgment. For the reasons explained below, Plaintiff's motion is **DENIED**, and Defendants' motion is **GRANTED IN PART, DENIED IN PART**.

**I.        FACTUAL BACKGROUND**

      **A.  FDA Warning Letter and OQSIE Engagement**

      On February 11, 2020, the FDA issued a warning letter to Defendant KVK, a generic pharmaceuticals manufacturer. ECF 161-1 at ¶¶ 1, 22. The Warning Letter alleged KVK's noncompliance with the Food, Drug, and Cosmetic Act and FDA regulations, and demanded that KVK remediate the alleged violations or face imminent "legal action without further notice." <u>Id.</u> at ¶¶ 24-25.

      The FDA also "strongly recommend[ed] that [KVK] retain a qualified consultant to assist in [its] remediation," and required KVK to "respond to [the FDA] in writing within 15 working

days" to "[s]pecify what [KVK had] done since [the FDA's] inspection to correct [the alleged] violations and to prevent their recurrence."  Id. at ¶¶ 26-27.

KVK's outside counsel recommended Plaintiff—Velez Enterprises (d/b/a OQSIE)—as a possible consultant.  Id. at ¶ 29.  Following that recommendation, Defendant Tabasso, President and In-House Counsel for KVK, reached out to OQSIE member Jaime Velez.  Id. at ¶ 30.

The following day, OQSIE's other member at the time, William Schmidt, visited KVK to discuss the potential engagement.  Id. at ¶ 33.  At that time, "the support that [KVK] requested initially revolved around . . . having to respond to the FDA in three weeks."  Id. at ¶ 31.

**B.  OQSIE's February 15, 2020 Proposal**

On February 15, 2020, OQSIE provided a proposal to KVK.  Id. at ¶ 36.  Per that proposal, OQSIE planned to investigate and respond to the Warning Letter in phases: (1) the initial response, (2) the assessments necessary to develop remediation proposals, and (3) remediation.  Id. at ¶ 35.

Importantly, it is undisputed that the February 15 proposal was not for actual remediation work.  Id. at ¶ 37; ECF 168-3 at ¶ 37.  Rather, the February 15 proposal addressed two phases of work lasting approximately six weeks, with a budget of $240,000.  ECF 161-1 at ¶ 38; ECF 168-3 at ¶ 38.  The first three-week phase involved developing KVK's initial Warning Letter response. The next three-week phase was "about organizing the remediation activities."  ECF 161-1 at ¶ 39; ECF 168-3 at ¶ 39.

KVK accepted the proposal on February 17, 2020, and work commenced.  ECF 161-1 at ¶ 59.  Notably, neither Party disputes that KVK has paid all fees associated with the February 15 proposal.  ECF 161-1 at ¶ 49; ECF 168-3 at ¶ 49.

**C.  OQSIE's March Proposals**

On March 3, 2020, OQSIE sent a "proposal support for remediation planning and execution." ECF 161-1 at ¶ 50; ECF 168-3 at ¶ 50. This proposal was for "a continuation of the planning and the execution activities associated with the [Warning Letter] response." Id.

The work connected to this proposal was to "inform what work needed to be done to meet the . . . initial commitments that were made to the FDA," and had a budget of $721,500. ECF 161-1 at ¶¶ 53, 55; ECF 168-3 at ¶¶ 53, 55. For this proposal, Defendants assert that Velez testified the work ran through August 21, 2020. ECF 161-1 at ¶ 54; but see ECF 168-3 at ¶ 54 (instead alleging that "Velez testified [] as to the estimate of when funds would be consumed by the team of consultants proposed at that time, and not for work that would be completed by that date"). Although this proposal accounted for consultants who were already working on the KVK project, it allegedly did not account for additional consultants who were added later. Id. Importantly, Schmidt testified that KVK "needed to approve" this proposal. ECF 161-1 at ¶ 56; ECF 168-3 at ¶ 56.

Yet, no one from KVK ever signed this March 3 proposal. ECF 161-1 at ¶ 57; ECF 168-3 at ¶ 57. To the contrary, on March 5, 2020, Tabasso wrote to Schmidt that "[w]e are in contact with a former FDA guy as a data integrity consultant. I want to interview him and then circle back." ECF 170-1 at ¶ 55.

That said, on March 9, 2020, OQSIE presented KVK with a "launch plan for post Warning Letter response activities." ECF 161-1 at ¶ 58. Defendants allege this launch plan was slated to take place over "the next four weeks or so." ECF 161-1 at ¶ 58. Plaintiff instead asserts that "the plain language of that document is clear in that it established a 12 months' timeline for Observation 2 activities and an estimate of between 20 and 38 consultants to support this activity." ECF 168-3 at ¶ 58.

Defendants also contend this proposal related to the "assessments and development of the remediation plan." ECF 161-1 at ¶ 59; but see ECF 168-3 at ¶ 59 (same objection). More precisely, Defendants note that Velez himself testified that the March 9 plan was "the execution of the plan of the commitments that were made in the Warning Letter." ECF 161-1 at ¶ 60; but see ECF 168-3 at ¶ 60 (same objection). In presenting the March 9 plan, Defendants assert that OQSIE indicated that it anticipated adding nine consultants to the team currently working with KVK. ECF 161-1 at ¶ 61; but see ECF 168-3 at ¶ 61 (denying that "KVK was not aware of the need for additional consultants at this time for the KVK Project because OQSIE's March 9, 2020 Proposal clearly and unambiguously established a 12 months' timeline for Observation 2 activities and an estimate of between 20 and 38 consultants to support this activity.")

While Defendants assert that no one from KVK ever signed off on this plan, in an email that same day, Tabasso responded that "the biggest challenge for us at this point is going to be seating," but that "[l]aptops will be here for everyone next Monday." ECF 163-10 at 2.

**D.  OQSIE April Request for More Consultants**

In an April 17, 2020 email, OQSIE requested to deploy additional consultants. ECF 159-3 at ¶ 19, ECF 163-11. It is not clear from the record whether a KVK representative ever responded to this email. That said, the record also reflects that OQSIE consultants continued their work for KVK and that KVK was aware OQSIE had deployed an additional twenty-nine consultants around this time. ECF 159-3 at ¶ 21.

**E.  OQSIE May Request for Master Services Agreement**

In May 2020, OQSIE requested that KVK enter into a Master Services Agreement. ECF 161-3 at ¶¶ 69-70; ECF 159-3 at ¶¶ 30-31. Specifically, on May 14, 2020, Velez emailed Kiran Vepuri, a KVK representative, stating that "[t]he response letter and associated protocols reference a services agreement document in place between KVK and OQSIE," and that Velez believed the Parties should execute one. Id. Despite this request, however, KVK and OQSIE never entered into an MSA or any other overarching contract. ECF 161-3 at ¶ 71; ECF 159-3 at ¶ 30.

### F. KVK Complaints

Around this same time, KVK began to express dissatisfaction with OQSIE's work, raising concerns about consultant efficiency and productivity. ECF 163-16. KVK also disputed several of OQSIE's bills. Id.; ECF 163-17. According to Defendants, OQSIE allegedly never addressed those concerns. ECF 161 at 7.

### G. June 2020 Remediation Plan and July 2020 Termination

In a June 17, 2020 presentation, OQSIE listed several additional remediation plans that had been or were soon to be submitted. ECF 161-2, Ex. 48. According to Defendants, no one from KVK ever signed off on these plans. Id.; but see ECF 168-3 at ¶ 75 ("It is specifically denied that KVK had not agreed for OQSIE to conduct the work in its remediation plan.").

In late June and early July 2020, OQSIE then provided KVK with several long-term remediation work proposals, offering a quote of "somewhere in the $10 million neighborhood." ECF 161-1 at ¶¶ 77-78; ECF 168-3 at ¶¶ 77-78; ECF 161-2, Ex. 16-19.

Neither Party disputes that KVK had no obligation to accept these later proposals, and that KVK in fact did not accept them. ECF 161-1 at ¶¶ 79-87; ECF 168-3 at ¶¶ 79-87. To the contrary, on July 4, 2020, KVK's outside counsel contacted OQSIE and requested that OQSIE's consultants pause their services. ECF 161-1 at ¶ 88; ECF 168-3 at ¶ 88. Shortly thereafter, KVK decided to

terminate the relationship. ECF 161-1 at ¶ 90; see also ECF 161-2, Ex. 22; but see ECF 168-3 at ¶ 90 (noting that "[i]t is specifically denied that KVK and Tabasso had not already decided at this time on or about July 4, 2020 to completely terminate KVK's relationship with OQSIE.")

On July 16, 2020, Velez and Tabasso had a call concerning OQSIE's termination.  ECF 161-1 at ¶ 93; ECF 168-3 at ¶ 93; ECF 161-2, Ex. 23.  On July 21, 2020, Velez sent Tabasso an email containing Velez's summary of the purported agreements reached on that call. According to Velez's email summary of the call, OQSIE had requested—among other things—payment on all outstanding invoices, as well as late fees on those outstanding invoices.  ECF 161-2, Ex. 23. Specifically, the email states that "KVK intends to pay the close to $1.9 million in open invoices" and "to pay open invoices on-time."  Id.

### H.  August 2020 Settlement Discussions

In August 2020, Tabasso and Velez exchanged several emails in an effort to potentially "settle" this unpaid invoice dispute.  ECF 159-3 at ¶¶ 46-49; ECF 161-2, Ex. 24-28.  Plaintiff argues these emails serve as evidence of both the July 2020 oral contract and the alleged earlier contemporaneous agreement between the Parties.  ECF 159-1 at 1, 20.  Defendants argue these are clearly settlement discussions, inadmissible under Federal Rule of Evidence 408.  ECF 170 at 27; see also ECF 163-27 (marking Tabasso's email as "SUBJECT TO FRE 408—OFFER TO SETTLE/COMPROMISE.")

### II.   PROCEDURAL HISTORY

Plaintiff filed its initial Complaint on November 11, 2020.  ECF 1. Defendants moved to dismiss that Complaint in January 2021.  ECF 4. After several rounds of briefing, this Court granted Defendants' motion on September 16, 2021, without prejudice.  ECF 18.  On October 6, 2021, Plaintiff filed an Amended Complaint, asserting the following four claims:

    I.     Breach of Contract against Defendant KVK-Tech, Inc.
    II.    Breach of Oral Contract against Defendant KVK-Tech, Inc.
    III.   Unjust Enrichment against Defendants Vepuri and Tabasso
    IV.   Unjust Enrichment against Defendant KVK-Tech, Inc.

ECF 20. Significant discovery ensued. During discovery, Plaintiff moved to compel several hundred documents that Defendants had designated as privileged or subject to the attorney-client work product doctrine. ECF 56. This Court appointed a Special Master, who reviewed the documents and provided the Court with several Reports and Recommendations. This Court adopted the Special Master's recommendations on April 29, 2024. ECF 157.

Shortly thereafter, the Parties filed cross-motions for summary judgment. ECFs 159, 160. Those motions are presently before this Court.[1]

## III.   PARTY CONTENTIONS

### A.  Defendants' Motion for Partial Summary Judgment

Defendants assert that Plaintiff's only plausible claim is for "unpaid invoices for work that OQSIE actually performed." ECF 161 at 25. In other words, Defendants contend that summary judgment is warranted for the vast majority of Plaintiff's claims because (1) Plaintiff has put forth no evidence of damages beyond these allegedly unpaid invoices, and (2) Plaintiff cannot prove that Defendants Tabasso and Vepuri are individually liable on an unjust enrichment theory. Id.

     i.       Breach of Contract (Count I)

---

[1] The Court notes that it had scheduled oral argument on the cross-motions for summary judgment for June 24, 2024, but the Court had to cancel this argument for personal reasons. ECF 179. Having now reviewed the briefs in more detail, however, the Court concludes that oral argument is not necessary and that the decisions as stated in this memorandum order are appropriate, taking into account Pennsylvania law on breach of contract and Third Circuit law on Rule 56 motions for summary judgment.

On Count I—Plaintiff's primary breach of contract claim—Defendants argue the undisputed evidence reflects that KVK never agreed to (1) "prohibiting interfering with consultants' work," (2) "prohibiting or restricting KVK's use of OQISE's work product," (3) "prohibiting termination of OQSIE (or requiring KVK to continue to use OQSIE for remediation)," or (4) "prohibiting KVK from recruiting and employing OQSIE consultants."  Id. at 26.  Thus, Defendants assert that, at most, Plaintiff would be entitled compensation for unpaid hours worked. Id.

ii.     Breach of Oral Contract (Count II)

On Count II—Defendants' breach of the Parties' alleged subsequent oral contract—Defendants contend "the undisputed evidence shows that the parties did not reach any 'mutual understanding' as to the terms."  Id. at 28.  While Defendants acknowledge that Velez emailed Tabasso a summary of Velez's understanding of the pivotal July 16, 2020 call, Defendants nonetheless argue there is "no evidence that KVK actually agreed to anything" reflected in that email.  Id. at 28.  In so arguing, Defendants note (1) the email states only that OQSIE "requested" KVK commit to paying certain outstanding invoices and late fees, id. at 29 (emphasis added), and (2) Velez himself has testified the same, explaining that Defendants "never disagreed, or [] voiced concerns or issues with it, so I [took] it as agreement," id. at 28.  And according to Defendants, a party's silence is generally insufficient to constitute acceptance of contractual terms under Pennsylvania law.  Id. (citing to Johnston the Florist, Inc. v. TEDCO Const. Corp., 657 A.2d 511, 516 (Pa. Super. Ct. 1995)).[2]

iii.     Unjust Enrichment Against Vepuri and Tabasso (Count III)

---

[2] Separately, Defendants contend the record unequivocally demonstrates there was "no forbearance on either side that would characterize a settlement agreement," and thus that there was "no consideration" to establish this oral contract.  Id. at 29.

Next, Defendants assert that Plaintiff's unjust enrichment claims against Vepuri and Tabasso must fail because "there was no benefit that was personally conferred on Vepuri or Tabasso at all, let alone an unjust one." Id. at 29.

They do so for two reasons.  First, according to Defendants, "simply being compensated based on [company] profits is not sufficient to support a claim for unjust enrichment."  Id. at 30. Second, even if such compensation could support an unjust enrichment claim, Defendants argue "there is no evidence that Vepuri and Tabasso's compensation [was] tied to KVK's profits."  Id.

As Defendants construe the record, Tabasso was merely an employee of KVK, and under the plain terms of Tabasso's employment contract, Tabasso was only entitled to a bonus if the company "experience[d] a *dramatic* increase in profit and/or value" based on triggering events wholly unrelated to the FDA matter.  Id.

Likewise, Defendants argue that Vepuri was nothing more than a consultant to KVK.  Id. at 31.  While Defendants acknowledge that "KVK is owned equally by three irrevocable trusts for the benefit of Vepuri's children," ECF 161-1 at ¶ 3, Defendants remain steadfast that (1) "Vepuri has no role with the Trusts and is not a beneficiary," and (2) the Trusts are irrevocable, precluding Vepuri's right to modify them.  ECF 161 at 31.

Lastly, Defendants contend that Plaintiff cannot pierce the corporate veil here because, for both Vepuri or Tabasso, none of the four relevant factors—which include (1) undercapitalization, (2) failure to adhere to corporate formalities, (3) substantial intermingling of corporate and personal affairs, and (4) use of the corporate form to perpetrate a fraud—are present.  Id. Moreover, even if those four criteria were met, Defendants further argue the doctrine only applies to the owners of a company, thus precluding liability for Tabasso, as president of KVK, or Vepuri, as a consultant to KVK.  Id. at 32.

iv.   <u>Damages</u>

Next, Defendants assert that Plaintiff is "not entitled to the majority of damages sought." <u>Id</u>.

First, Defendants argue that "OQSIE cannot recover late fees or interest of any sort because . . . there was never any agreement—written or oral—for KVK to pay late fees or interest." <u>Id.</u> at 32-33.  Defendants further contend that "although KVK paid invoices late prior to termination of the relationship, OQSIE never charged late fees or interest on those invoices," which means "there was also no course of conduct that could possibly evidence any intent by KVK to be bound by OQSIE's claimed late fees or interest." <u>Id.</u> at 33.

Second, Defendants assert that "OQSIE cannot recover lost profits that it claims it would have made but for KVK's rejection of its remediation proposals and termination of the relationship," as there was "never any agreement by KVK to continue to use OQSIE for any work, nor was there any agreement governing damages available in the event of termination." <u>Id.</u> at 34.

Third, Defendants assert that the consequential damages Plaintiff seeks here are "at best speculative." <u>Id</u>.  Plaintiff's claim for "lost business opportunities," Defendants contend, is "entirely based on the assumption that if OQSIE had not been financially harmed by KVK's termination, it **would have** submitted competitive bids for projects with other firms and **may have been awarded** those projects **if its bid had been accepted**." <u>Id.</u> at 35 (emphasis in original). Likewise, Defendants assert that Plaintiff's claim that "TD Bank refused to extend its line of credit as a result of KVK's actions" is "unsubstantiated," as there is "no evidence tying TD Bank's cancellation of OQSIE's line of credit to any act or omission by Defendants." <u>Id</u>.  Similarly, Defendants argue that "OQSIE's claim for damages based on the impact to its reputation is based

on OQSIE's unsupported claim that consultants who worked on the KVK project refused to work with OQSIE again."[3] Id.

### v. Attorney's Fees

Lastly, Defendants argue that where, as here, no agreement or statutory basis exists for awarding attorneys' fees, a court may award a partial summary judgment precluding the recovery or award of attorneys' fees. Id. at 36 (citing to S. Middleton Twp. v. Amerifreight Sys. LLC, 2018 WL 4207765, at *3-4 (M.D. Pa. Sept. 4, 2018)).

### vi. Plaintiff's Response

Plaintiff responds largely by directing this Court to Plaintiff's own motion for partial summary judgment, described in more detail below.  In brief though, Plaintiff first counters that "pursuant to Pennsylvania law, there was a clear meeting of the minds as to the essential terms of the agreement between Plaintiff and KVK," and "the undisputed facts support that KVK materially breached the agreement by failing to pay for the services performed pursuant to that agreement." ECF 168-2 at 4.

Second, Plaintiff asserts that—even if no contract existed—"[a]ll Defendants, including individual Defendants Anthony Tabasso and Murty Vepuri were unjustly enriched (at the minimum)" for the unpaid invoice amounts. Id. at 5.

Third, Plaintiff argues a genuine dispute exists as to whether Plaintiff is "entitled to recover consequential damages such as lost profits and additional expenses" flowing from Defendants'

---

[3] In raising these arguments, Defendants also note that by order dated April 29, 2024, this Court "advised counsel that Plaintiff [is] under a pretrial obligation to supplement [its] very 'generic' statement of damages [] with additional details." ECF No. 157.  Defendants assert that Plaintiff did not produce any additional evidence in support of its claims.

alleged misconduct.  Id. at 6.  Specifically, Plaintiff asserts it suffered the following consequential damages:

- Line of Credit fully utilized to pay consultants for work on the KVK Project;

- Interest and fees paid to various banks/lenders to pay its consultants and meet other financial obligations for the KVK Project when Defendants failed to pay Plaintiff's outstanding invoices;

- Inability of Plaintiff to secure new work/projects because the consultants it used on the KVK Project remain partially unpaid and/or reputational harm Plaintiff suffered in the industry;

- Inability of Plaintiff to secure new work/projects lines of credits/financing was no longer available to Plaintiff.

Id.  Plaintiff also asserts that it "submitted documentary evidence as to its damages (direct and consequential) and is entitled to present additional testimonial and expert evidence concerning its damages."  Id. at 7 (citing to USI Ins. Servs. Nat'l, Inc. v. Frieman, 273 A.3d 1039 (Pa. Super. Ct. 2022)).

**B.  Plaintiff's Motion for Partial Summary Judgment**

Plaintiff, as just noted, also moves for partial summary judgment on three grounds.

i.      Breach of Contract (Count I)

First, Plaintiff contends there is no genuine dispute that "there exists a valid, enforceable agreement for KVK to pay for the services rendered by OQSIE consultants for their work on the KVK Project." ECF 159-1 at 13.  As Plaintiff construes the record, "the emails between the parties, the assent to the work performed, the payment of invoices for months, KVK's requests for additional work and additional consultants including prior notice of their hourly rates, evidence a valid, enforceable contract."  Id. at 14.  Thus, according to Plaintiff, Defendants' failure to pay various outstanding invoices amounts to a breach.  Id.  Plaintiff therefore argues this Court should

12

grant summary judgment as to the sum of those invoices, which Plaintiff alleges to be $1,948,070.48. Id.[4]

    ii.    <u>Breach of Oral Contract (Count II)</u>

Second, Plaintiff asserts "there was a July 16, 2020 meeting during which Mr. Velez, on behalf of Plaintiff, and Defendant Tabasso discussed those outstanding invoices," and at which "KVK agreed to pay the approximate $1.9M in open invoices." <u>Id.</u> at 20. Likewise, Plaintiff notes the record here contains an "August 10, 2020 email in which KVK's CEO, and a lawyer (Anthony Tabasso), express[es], on behalf of Defendant KVK that they would settle the claims and pay the outstanding invoices." <u>Id.</u>

These communications, Plaintiff contends, separately entitle Plaintiff to summary judgment on Defendants' unpaid invoices because "either an oral agreement to settle the claims for payment of the outstanding invoices existed, or an implied-in-fact agreement existed." <u>Id.</u>

    iii.    <u>Unjust Enrichment (Count III)</u>

Third, Plaintiff argues that if this Court does not grant summary judgment in favor of Plaintiff's breach claims, it should do so in favor of Plaintiff's unjust enrichment claims. <u>Id.</u> at 24. According to Plaintiff, the record unequivocally reflects that "Defendant KVK has been unjustly enriched in the following ways:

    1.    Receiving the services of the OQSIE consultants' services without payment;

    2.    Use of OQSIE's work product without payment;

---

[4] Plaintiffs further assert that "as of May 30, 2024, all outstanding unpaid OQSIE invoices accrued simple interest at a rate of one (1%) percent per month pursuant to the parties' email exchange [], which results in pre-judgment interest that accrued at a rate of $19,480.70 per month on the outstanding principal balance of $1,948,070.47, for 47 months since May 30, 2020, for a total sum of $915,593.13." <u>Id.</u> at 19.

3. The benefit of having OQSIE consultants onsite, performing work on their response to the FDA Warning Letter, incurring expenses for which it did not pay for; and

4. The appearance to the government (FDA) of having spent millions of dollars on OQSIE consultants, while only having spent a fraction thereof."

Id. at 24.  Likewise, Plaintiff asserts that Defendants Tabasso and Vepuri were unjustly enriched because "they either received additional profits or did not suffer further losses" as a result of OQSIE's work product.  Id. at 25. In other words, Plaintiff argues that "KVK and the Individual Defendants benefited by presenting OQSIE's work product as having been paid by KVK in that the FDA did not outline further issues." Id. at 25.

Plaintiff further argues that "Defendant Vepuri also benefited by his use OQSIE's work product in establishing the Deferred Prosecution Agreement with the federal government." Id.

iv.    Defendants' Response

Defendants' counterarguments largely mirrors those made in Defendants' own motion for partial summary judgment, so the Court rehashes them only briefly.

First, Defendants assert that "material issues of fact exist concerning whether the parties ever entered into a contract governing the majority of the work OQSIE performed, and, if so, the terms of such a contract." ECF 170 at 22.  Specifically, Defendants assert that—apart from KVK's assent to OQSIE's initial February 15, 2020 proposal—Plaintiff relies exclusively on "a number of documents and emails exchanged" to establish the terms of the ongoing arrangement, including Plaintiff's coveted 1% monthly interest rate for each unpaid invoice.  Id. at 24, 35.  But, as Defendants construe the record, there is simply "no agreement concerning the scope of [this subsequent] work to be performed by OQSIE, adding additional consultants, or the estimated cost of that work." Id. at 25.   Defendants further assert the same rings for Plaintiff's claims of an oral contract created in July and August 2020, as Defendants argue that (1) Tabasso never actually

14

agreed to anything during his discussions with Velez, and (2) all such later discussions are now "inadmissible settlement discussions that took place in an effort to resolve the dispute between the parties before this litigation." Id. at 27.

Second, for both the breach and unjust enrichment claims, Defendants contend that "material issues of fact exist concerning the amounts that OQSIE claims are due, as a result of OQSIE both recommending work that was unnecessary and overbilling KVK due to underperformance and inefficiency." Id. at 22. Indeed, Defendants contend "the evidence shows that KVK grew dissatisfied with OQSIE's work," "believe[ed] it to be untimely and of unacceptable quality," "disagreed with the rate at which work was performed," and contemporaneously "disput[ed] OQSIE's invoices." Id. at 25. According to Defendants, these quality-based disputes preclude Plaintiff's argument that the Parties' "course of conduct" definitively established that Plaintiff is entitled to the invoices it seeks. Id. Even for those invoices KVK did pay, Defendants contend, "the parties never resolved the outstanding issues to KVK's satisfaction, because OQSIE's response was to provide less transparency rather than seek to reach agreement on scope and billing." Id. at 26.

Lastly, Defendants reiterate that this Court should deny Plaintiff's motion for summary judgment on the unjust enrichment claims against the Tabasso and Vepuri because there is no evidence Tabasso and Vepuri were themselves enriched by any work that OQSIE performed for KVK. Id. at 33.

## IV.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed."  Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

## V.    DISCUSSION

At the outset, the Court notes the record here clearly reflects an ongoing consulting arrangement.  Beginning in February 2020, OQSIE would propose short-term, multi-week projects, after which KVK representatives—namely Tabasso—would sometimes approve via email.

Initially, this ad-hoc arrangement appears to have worked reasonably well.  By July 2020, however, the relationship had deteriorated, culminating in (1) KVK's rejection of OQSIE's long-term remediation proposal, and (2) KVK's termination of the relationship.

Thus, the key question—at least for summary judgment purposes—is whether this series of emails is sufficiently "clear" and "unambiguous" to resolve the case at this stage. Allegheny Int'l v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir.1994). That is because under Pennsylvania law, "unambiguous writings" may be "interpreted by the court as a question of law," whereas "ambiguous writings" must be "interpreted by the fact finder." Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 n.10 (3d Cir.1980).

### A. Ambiguity Precludes Summary Judgment for Either Party

To discern if such ambiguity exists, a Court must ask whether a writing "is reasonably susceptible of different constructions and capable of being understood in more than one sense." Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (1986) (citations omitted); see also Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir.1994) ("If the contract is determined to be ambiguous, then the interpretation of the contract is left to the factfinder, to resolve the ambiguity in light of extrinsic evidence").

Here, the ad-hoc nature of the Parties' arrangement—as reflected by this series of relatively cursory emails—undoubtedly generates sufficient ambiguity to preclude summary judgment for either Party. To highlight that ambiguity, the Court need look no further than each Party's divergent yet arguable interpretation of these correspondences. As Plaintiff sees it:

> In May and June 2020, Defendants Tabasso and Vepuri demanded that OQSIE deliver work product outside of the scope of work agreed to in March 2020, which was exclusively focused on supporting actions committed by KVK in the response to the Warning Letter issued in early March 2020, OQSIE's scope of work was communicated to the FDA in the response to the Warning Letter, which increased the amount of work that OQSIE consultants had to perform on the KVK Project.

ECF 159-3 at 5. By contrast, Defendants frame the record as follows:

> OQSIE recommended work far beyond that necessary to respond to
> the FDA warning letter, performed work in an untimely manner, and
> was inefficient and unproductive, leading to overbilling.

ECF 170 at 7.  Simply put, Plaintiff's assertion that Defendants' imposed additional demands on

Plaintiff is antithetical to Defendants' contention that Plaintiff unilaterally exceeded their mandate.

Perhaps more importantly, the Court's independent review of this holistic set of exchanges

does nothing to resolve the ambiguity regarding the true scope of the arrangement.  While this

review revealed several instances of OQSIE expressly soliciting KVK approval for a particular

number of additional consultants at a specified rate, see, e.g., ECF 163-11, the precise nature of

the work tied to those roles are often unclear, if not entirely absent from the exchanges. id.

Moreover, the clarity of each of these piecemeal proposals—along with KVK's alleged

acceptance or lack thereof—faded over time, with the cleanest examples of agreement formation

occurring in the earlier (less relevant) February and March 2020 time periods.  It is telling, for

instance, that Plaintiff's own undisputed statement of material facts indicates that KVK "signed

and accepted" OQSIE's initial February 15, 2020 proposal, but then more narrowly states that—

from April through June 2020—OQSIE merely "advised KVK" of the need for additional

consultants, or "requested" that KVK execute an overarching Master Service Agreement.  ECF

159-3 at ¶ 9; see also ECF 163-9; ECF 163-20; ECF 163-21; ECF 163-34.

Likewise, the seriatim nature of this arrangement precludes this Court from concluding, as

a matter of law, that particular invoices are unambiguously tied to a particular interim agreement.

While many of these invoices are dated, see ECF 163-14, Plaintiff's claim hinges on proving

whether, when, and to what extent KVK approved the hours for which OQSIE consultants billed.

In the Court's view, the ambiguity within these seriatim exchanges and the invoices themselves

make that impossible, at least for the purposes of summary judgment.

Further complicating this task, Defendants also plausibly claim that Defendants' nonpayment of some or all of these invoices was justified due to Plaintiff's inefficiencies or overbilling.  Particularly because Defendants' complaints increased over time, there remains a genuine dispute as to whether these communications may have altered the scope of each interim agreement.

In sum, this series of emails does not unambiguously set forth the essential terms of the Parties' arrangement, or even clearly demonstrate the existence of an agreement.  And so where, as here, the fluid nature of a consulting relationship renders the underlying terms of the agreement unclear, it is for the fact-finder, rather than the Court, "[to] look to extrinsic evidence to determine the parties' intent, such as the parties' course of conduct throughout the life of the contract as 'evidence of a prior course of dealing can establish a party's awareness of and consent to intended contractual terms.'"  Roman v. Unigroup Worldwide, Inc., 2014 WL 2504586, at *9 (W.D.Pa. May 28, 2014) (citations omitted); cf Azer Sci. Inc. v. Quidel Corp., 2022 WL 17419347, at *8 (E.D. Pa. Dec. 5, 2022), reconsideration denied, 2023 WL 289696 (E.D. Pa. Jan. 18, 2023) (analyzing a series of emails where "the Parties agreed in writing to the projects' essential terms, including price, product, quantity, and time-commitment").[5]

To be clear, Plaintiff may ultimately succeed at trial in proving it is entitled to each and every allegedly unpaid invoice.  Just as Defendants may succeed in showing that Plaintiff is entitled to far less, or nothing at all.  But these questions of fact are not appropriate at summary

---

[5] To the extent Plaintiff relies on Azer for anything other than contract formation issues, that reliance would be misplaced.  As the Judge Gallagher noted, defendant in that case did "not make arguments concerning the other elements of [plaintiff's contract] claims," id. at *8 n.16, and so that case did not speak to ambiguity as to contract meaning where a valid contract exists.

judgment.[6] Simply put, there are distinct credibility disputes between the Parties that make necessary a jury verdict as to the existence of a relevant agreement and the terms governing any such agreement.

### B.  A Genuine Dispute Exists as to Consequential Damages

Next, the Court addresses Defendants' motion for summary judgment as to Plaintiff's consequential damages—namely lost profits from future business opportunities and reputational harms.  As Defendants correctly observe, this Court previously "advised counsel that Plaintiff [is] under a pretrial obligation to supplement [its] very 'generic' statement of damages [i.e., Exhibit 31, D-33] with additional details."  ECF No. 157.  According to Defendants, Plaintiff did not produce any additional evidence in support of its claims.

Consequential damages are recoverable for breach of contract claims if "(1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty."  See Ferrer v. Trustees of U. of Pennsylvania, 825 A.2d 591, 610 (Pa. 2002) (internal citations omitted).  Further, under Pennsylvania law, there is no "question that a party can obtain lost profits as a form of consequential damages in a breach of contract case." Vinculum, Inc. v. Goli Techs., LLC, 310 A.3d 231, 250 (Pa. 2024).   That extends to (1) lost primary profits, (2) lost secondary profits, and (3) loss of prospective profits, or "good will damages," AM/PM Franchise Ass'n v. Atl. Richfield Co., 584 A.2d 915, 920 (Pa. 1990), but precludes recovery for "merely speculative" damages, Delahanty v. First Pennsylvania Bank, N.A., 464 A.2d 1243, 1258 (Pa. Super. Ct. 1983).

---

[6] For the same reason, Plaintiff's motion for summary judgment as to the unjust enrichment claims against Defendant KVK are denied.  As the Court reads the record, a material dispute remains as to the precise nature and amount of any potentially unjust benefit conferred.

Here, the Court concludes that Plaintiff's asserted damages are not "so speculative as to deny them an attempt at recovery." AM/PM Franchise Ass'n, 584 A.2d at 918. For instance, on reasonably foreseeable lost business opportunities, Defendants themselves admit that "OQSIE referenced one other company to whom it did submit proposals"—proposals which allegedly floundered due to OSQIE's falling out with KVK. ECF 161-1 at ¶ 145; see also ECF 168-3 at ¶ 145 (noting that "Plaintiff produced 9 proposals that it had submitted and lost in 2020 and 2021 as part of its original and supplemental production to KVK").

Likewise, Defendants admit that OQSIE has produced a "list of OQSIE consultants that supported KVK who have not worked with OQSIE since 2020," even if Defendants again argue that nothing in the record ties this discontinuity to KVK. ECF 161-1 at ¶¶ 146-49.

Similarly, while Defendants assert that "[t]he only evidence that Plaintiff has to support its claims regarding its line of credit are one letter from TD Bank's counsel notifying OQSIE that it would not extend the maturity date of the line of credit, a commercial loan payoff quote, and a forbearance agreement term sheet," ECF 161 at 21, Defendants ignore that the context and timing of that cancellation could enable a reasonable jury to find a linkage between the cancellation and the KVK matter.

Perhaps more importantly, for most of these alleged harms, Jaime Velez himself testified as to the requisite connection between the loss and KVK, and will undoubtedly do so again at trial. See e.g., ECF 161-2, Ex. 8 ("So we used our full line of credit to cover for the funds that we were supposed to receive from KVK, fully consumed it, didn't have any funds available to pursue any significant new projects . . . And then the line of credit was called and canceled by TD Bank."); see also ECF 168-3 at ¶ 141 ("Jaime Velez will provide testimony regarding the relationship

between Defendants' acts and omissions and Plaintiff's cancellation of the line of credit, as well as its use").

While the Court is skeptical of Plaintiff's overall $16.8 million in estimated damages, the precise amount is not the question presently before this Court. Instead, this Court must ask whether, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff is entitled to consequential damages of the type alleged.  See, e.g., Martin v. City of Reading, 118 F. Supp. 3d 751, 782-83 (E.D. Pa. 2015); SEC v. Thrasher, 152 F.Supp.2d 291, 297 (S.D.N.Y. 2001) (observing that Rule 56, which permits the Court to resolve certain factual disputes after passing on, and declining to grant, a request for summary judgment, "does not allow a party to bring a motion for a mere factual adjudication").

The Court is persuaded that Plaintiff should have the opportunity make its case. Particularly where, as here, the Court intends to bifurcate trial as to liability and damages—as discussed in more detail below—it would be premature for this Court to preclude the mere possibility of consequential damages.

### C.  Plaintiff's Unjust Enrichment Claims Against Tabasso and Vepuri Fail

By contrast, Plaintiff cannot succeed on its unjust enrichment claims against Tabasso and Vepuri.  Under Pennsylvania law, a plaintiff claiming unjust enrichment must prove that (1) the plaintiff conferred a benefit on the defendant; (2) the benefit was at the expense of the plaintiff; and (3) under the circumstances, equity demands restitution to the plaintiff.  Torchia ex rel. Torchia v. Torchia, 499 A.2d 581, 582-83 (Pa. Super. Ct. 1985); Streamline Bus. Grp., LLC v. Vidible, Inc., 2016 WL 3523033, at *2 (E.D. Pa. June 27, 2016) (Baylson, J.).

Critically though, unjust enrichment claims against a "corporate officer or employee of a corporation" fail where (1) the action pertains to a contractual dispute, and (2) the officer or

employee's "interactions with a plaintiff are on behalf of the company and not themselves individually." Streamline Bus. Grp., LLC, 2016 WL 3523033, at *3; see also Walsh v. Alarm Sec. Grp., Inc., 95 F. App. 399, 402 (3d Cir. 2004) ("Unless the corporate officer extends promises in his individual capacity, the participation theory [for unjust enrichment claims] does not apply in the context of an action for breach of contract"); 18 KT.TV, LLC v. Entest Biomedical, Inc., 2011 WL 5374515, at *7 (M.D. Pa. Nov. 7, 2011); Germain v. Wisniewski, 2017 WL 168499, at *3 (W.D. Pa. Jan. 17, 2017); Goodwin v. Am. Marine Express, Inc., 2021 WL 848948, at *23 (N.D. Ohio Mar. 5, 2021).

Tabasso—as President and In-House Counsel of KVK—falls squarely within this prohibition. True, as Plaintiff notes, Tabasso's employment agreement with KVK entertains the possibility of (1) a discretionary annual bonus and (2) a "windfall bonus . . . in the event [KVK] experiences a dramatic increase in profit and or value," ECF 161-2, Ex. 4, which might suggest some form of indirect benefit flowing to Tabasso from KVK's alleged failure to pay OQSIE. But Defendants persuasively counter that such indirect compensation is not sufficient to support a claim for unjust enrichment. If it were, any employee who received equity compensation could be held liable for an employer's interactions with respect to a third party. Imposing such a rule would amount to "a great expansion of the [unjust enrichment] doctrine," 18 KT.TV, LLC, 2011 WL 5374515, at *7, which this Court declines to do. Accordingly, where, as here, "the unjust enrichment claim is not based on allegations that would amount to a tort," but instead "the same allegations that support Plaintiff's breach of contract claims," this Court concludes that "Plaintiff's unjust enrichment claim against a corporate officer" like Tabasso cannot survive summary judgment. Germain, 2017 WL 168499, at *4.

The same is true for Vepuri. Although Vepuri's alleged direct financial interest in KVK potentially exceeds Tabasso's,[7] Plaintiff still fails to articulate a sufficient theory as to how Vepuri (or his proxies) have been unjustly enriched here, beyond the cursory suggestion that KVK "received additional profits or did not suffer further losses."[8]

Likewise, Plaintiff simply does not contend that Vepuri somehow abused the corporate form here, let alone direct this Court to evidence in record reflecting such abuse. That failure precludes any sort of alter ego theory that might warrant piercing the corporate veil.

As such, Defendants' motion for summary judgment is **GRANTED** as to Count III for both Tabasso and Vepuri.

### D.  Plaintiff Fails to Rebut Defendants' Attorney's Fees Argument

Defendants' motion regarding attorney's fees is also **GRANTED**. As Defendants correctly note, Plaintiff's briefing here does not address Defendants' contention that "[u]nder the 'American Rule,' parties are ordinarily responsible for their own attorneys' fees, regardless of the outcome," unless "there is expressed statutory authorization, an agreement between the parties, or another established exception." ECF 161 at 30 (citing to Aaron v. State Farm Fire & Cas. Co., 2017 WL 3484087, at *3 (E.D. Pa. Aug. 14, 2017); Sherman v. State Farm Ins. Co., 2017 WL 5559911, at *3 (E.D. Pa. Nov. 17, 2017)). Thus, even if such an agreement or exception did exist here,

---

[7] As Defendants readily admit, "KVK is owned equally by three irrevocable trusts for the benefit of Vepuri's children." Moreover, Vepuri himself testified that "it's the perception" that he owns KVK.

[8] While Plaintiff does also argue that Vepuri "benefitted by his use [of] OQSIE's work product in establishing the Deferred Prosecution Agreement with the federal government," Defendants are entirely correct that Plaintiff has not submitted any evidence tying that agreement, which KVK entered in 2024, to any of OQSIE's work performed in 2020. The Court also agrees with Defendants that evidence of this The Deferred Prosecution Agreement is inadmissible in that it is not relevant and is highly prejudicial, precluding its consideration here.

24

Plaintiff's failure to rebut Defendants' argument dooms any bid for attorney fees.  Celotex, 477 U.S. at 322.

### E.  Bifurcation

Finally, as alluded to above, the Court has determined that the remaining liability claims must be bifurcated from any evidence of damages.  The Court does so for two primary reasons.

First, it is likely that—in the absence of a written agreement between the Parties despite this ongoing consulting arrangement—Plaintiff will, at a minimum, be able to show a right to recovery based on the doctrine of quantum meruit.  Yet, the exact damages to which Plaintiff may be entitled under this doctrine will require specific testimony at a trial after liability, and may even depend on jury answers to specific interrogatories dealing with precise time periods as to which Plaintiff may establish liability against defendant.

Second, the liability phase may appropriately include a jury's verdict on Plaintiff claims for consequential damages, which, if in favor of Plaintiff, would enable specific testimony before a separate jury as to how much in consequential damages Plaintiff is entitled.

### VI.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment is **DENIED**. Defendants' motion for partial summary judgment is **GRANTED IN PART**, **DENIED IN PART**.

The Court will schedule a telephone conference to discuss a trial date, unless the Parties are interested in continuing mediation with the Special Master or conducting settlement conferences, both of which the Court strongly encourages.  An appropriate order follows.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 20\20-5553 Velez v KVK-Tech\20-5553 - MSJ Memorandum_6.25.docx