**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **VELEZ ENTERPRISES LLC d/b/a OQSIE** | **CIVIL ACTION** |
| **v.** | **NO. 20-5553** |
| **KVK TECH, INC.** | |

<u>**MEMORANDUM OPINION**</u>

**Baylson, J.**                                                                                    **October 16, 2024**

## I.   INTRODUCTION

This case involves Plaintiff Velez Enterprises LLC's (OQSIE) breach of contract and unjust enrichment claims against Defendant KVK-Tech, Inc. ("KVK").  Plaintiff alleges that Defendant failed to pay roughly $1.9 million in consulting fees associated with Defendant's efforts to remediate several compliance violations raised by the Food and Drug Administration ("FDA"). A bench trial was held before this Court, concluding on October 4, 2024.  For the reasons explained below, this Court finds that Plaintiff showed, by a preponderance of the evidence, that an implied-in-fact contract[1] [2] existed between the parties and that the elements of unjust

---

[1] While "courts should not recast a pleading not intended by the parties," they may address causes of action that can "reasonably be interpreted as alleging the existence of a contract." See Steiner v. Markel, 968 A.2d 1253, 1260 (Pa. 2009); Bricklayers of Western Pennsylvania Combined Funds, Inc. v. Scott's Dev. Co., 90 A.3d 682, 696 (Pa. 2014) (holding that Complaint could not reasonably be interpreted to allege the existence of an implied contract and as such appellate court's *sua sponte* determination that an implied contract existed was error.  The Court's conclusion was premised on the fact that the complaint did not include the key facts necessary to support a claim for implied contract).  In contrast, in this case, Plaintiff's Complaint alleged the key facts necessary to support a claim for implied contract.

[2] Further, as a fact-pleading jurisdiction, in determining the sufficiency of pleadings, Pennsylvania courts review a complaint's allegations to determine whether the facts state a cause of action on any theory.  See Cardenas v. Schober, 783 A.2d 317, 325 (Pa. 2001) ("it is the duty of the court to discover from the facts alleged in a complaint the cause of action, if any, stated therein."); Lobolito, Inc. v. North Pocono Sch. Dist., 755 A.2d 1287, 1292-93 (Pa. 2000) (Pennsylvania Supreme Court determined that Plaintiff's Complaint alleged facts to support recovery under a theory of promissory estoppel sufficient for it to survive the preliminary objection stage, even though Plaintiff did not plead any theory of equitable relief.) (distinguished by Steiner).

enrichment or promissory estoppel are met in this case, although Plaintiff's recovery is limited to breach or an equitable remedy.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

On February 11, 2020, the FDA sent Defendant, KVK, a Warning Letter ("Warning Letter") that observed that KVK failed to: (1) document and establish the accuracy, sensitivity, specificity, and reproducibility of its test methods ("Observation 1"), (2) thoroughly investigate any unexplained discrepancy or failure of a batch or any of its components to meet any of its specifications ("Observation 2"), and (3) exercise appropriate controls over computer or related systems to assure that only authorized personnel institute changes in master production and control records ("Observation 3").  Ex. P-1.  The Warning Letter also strongly recommended that KVK enlist an independent third-party.  Ex. P-1 at 3, 4, 5.  On February 13, 2020, at the recommendation of its regulatory counsel, David Rosen, KVK's President and CEO, Mr. Tabasso, spoke with OQSIE's representative, Jaime Velez, about the Warning Letter and OQSIE's ability to assist with KVK's response.  On February 15, 2020, the parties executed a contract for $240,000 and six weeks' worth of work.  Ex. P-3.  It is undisputed that Defendant paid Plaintiff in full pursuant to this contract.  However, Plaintiff continued to provide consulting services for Defendant until its July 2020 termination.  Plaintiff argues that Defendant's failure to pay the outstanding invoices in full is a breach of contract or in the alternative that Defendant was unjustly enriched.

Plaintiff initiated this action in 2020 when it filed a Complaint against KVK, Anthony Tabasso, and Murty Veperi.  ECF 1.  In 2021, Plaintiff filed an Amended Complaint alleging breach of contract (Count I), breach of oral contract (Count II), and unjust enrichment (Counts III and IV).  ECF 20.  Counts I, II, and IV were brought against KVK and Count III was brought

2

against the individual defendants, Anthony Tabasso and Murty Veperi.  The claims against the individual defendants were dismissed at the summary judgment stage.  ECF 181.

The three counts against KVK were tried in a non-jury case before this Court.  At the conclusion of trial, this Court found that Plaintiff established, by a preponderance of the evidence, that Defendant was liable for promissory estoppel, unjust enrichment, or implied-in-fact contract.

## III.    DISCUSSION

### A. Breach of Oral Contract (Count II)

This Court finds that Defendant is not liable for breach of oral contract.

Count II is limited to an alleged July 16, 2020, conversation between Mr. Velez and Mr. Tabasso where Mr. Tabasso agreed to pay the outstanding invoices.  This conversation was allegedly summarized in a July 21, 2020, email from Mr. Velez to Mr. Tabasso.  ECF 20 at ¶¶ 99, 100.  However, Plaintiff did not present any testimony regarding this conversation at trial and Defendant moved for a directed verdict, which this Court took under advisement.  As Plaintiff presented no evidence at trial, it has not established Defendant's liability as to Count II.

### B. Breach of Contract (Count I)

This Court finds that Defendant is not liable for breach of contract because there is no enforceable written contract.

To prove breach of contract a plaintiff must show: "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages."  Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247,

1258 (Pa. 2016).  Importantly, "[i]ssues of contractual interpretation are questions of law."
Tiburon Lockers, Inc. v. Northgate Dig. Corp., 289 F.Supp.3d 639, 644 (E.D. Pa. 2018) (Rufe).

The threshold question is whether an enforceable contract was executed.  To determine whether there is a valid contract under Pennsylvania law, the court must "look to: (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." ATACS Corp. v. Trans World Commc'n, Inc., 155 F.3d 659, 666 (3d Cir.1998).

At trial, Velez presented several emails, proposals, and estimates to support its contention that a written contract existed between the parties.  The March 9, 2020, email and accompanying proposal are the closest the parties came to executing a written contract.

### i.   Manifestation of Intent

The parties manifested an intent to be bound by the March 9, 2020, agreement.

To determine whether parties manifested an intent to be bound, "the object of the inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior.  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 582 (3d Cir. 2009).  Importantly, "[t]he presence or absence of a signed writing is relevant to that determination, but is not dispositive."  Shell's Disposal and Recycling, Inc. v. City of Lancaster, 504 Fed.App'x 194, 201 (3d Cir. 2012) (non-precedential).

On March 9, 2020, Mr. Velez emailed Mr. Tabasso a proposal regarding the steps needed to address the FDA's Warning Letter observations.  Ex. P-51.  Mr. Velez also asked Mr. Tabasso to approve nine consultants for deployment on March 16, 2020.  Mr. Tabasso responded: "[l]aptops will be here for everyone next Monday [March 16]."  Exs. P-28, P-52.

Mr. Tabasso manifested KVK's intent to be bound by the terms of the March 9, 2020, agreement when he confirmed that the consultants' laptops would be ready, approving their deployment.  Also, KVK provided OQSIE's consultants access to KVK's facility and documents. Additionally, the parties held weekly governance team meetings where OQSIE updated KVK on its work.  On cross-examination, Mr. Tabasso agreed that KVK could have rejected future work or terminated OQSIE at any of these meetings.

On March 9, 2020, the same day the proposal was sent to Mr. Tabasso, KVK and OQSIE representatives signed the "Prospective Assessment Protocol."  Ex. P-82.  The protocol defined the methodology to be employed for Observation 2.  The March 9, 2020, proposal included "initial protocol execution" as its first step.  Similarly, On May 15, 2020, a training protocol was signed by representatives of both parties.  Ex. P-68.  The training protocol was part of the March 9, 2020, proposal's scope of work for Observation 1.

Most importantly, KVK represented to the FDA that OQSIE was helping it respond to the Warning Letter observations.  In its April 3, 2020, update, KVK represented to the FDA that it had "engaged" OQSIE, including for work that OQSIE proposed in the March 9, 2020, proposal.

1) KVK told the FDA that "[t]he OQSIE Consultants Team will conduct a laboratory assessment at the Newton, PA manufacturing facility."  Ex. P-30 at 2.  In the March 9, 2020, proposal OQSIE proposed performing a "[c]omprehensive review of laboratory operations." Ex. P-51 at 5.

2) KVK told the FDA that "[t]he OQSIE Consultants Team will conduct batch records review and gap assessments of the processes at the manufacturing facility."  Ex. P-30 at 2.  This is a reference to the "retrospective" review.  In the March 9, 2020, proposal OQSIE proposed, among other things, dispatching 5 to 10.1 consultants to review batch records, 3 to 5.5

consultants to review complaints, and 5 to 7.6 consultants to review deviations and events. Ex. P-51 at 7.

3) KVK told the FDA that "[t]he OQSIE Consultants Team is performing a review of the batch records and analytical records prior to releasing the lots for market distribution." Ex. P-30 at 2. This is a reference to the "prospective" review. In the March 9, 2020, proposal OQSIE proposed, among other things, dispatching 5 to 10.1 consultants to review batch records and 1 to 2.1 consultants to review CAPA (corrective and productive action). Ex. P-51 at 7.

4) KVK told the FDA that "[t]o evaluate KVK Tech's data integrity practices, the OQSIE Team will conduct data integrity reviews and assessments across KVK Tech's manufacturing facility and testing laboratories including Research and Development cGMP support activities." Ex. P-30 at 2. In the March 9, 2020, proposal OQSIE proposed that consultant Thomas Thuene oversee the data integrity project, including conducting an "[i]nitial assessment of potential Data Integrity practices" and "develop[ing] a plan to address each gap identified in [the] assessment." Ex. P-51 at 8. Additionally, Mr. Theune was one of the nine consultants approved by KVK in the March 9, 2020, email. On March 9, 2020, Mr. Tabasso wrote to Mr. Velez, "Dr. Theune should be up and running by now." Ex. P-52.

The evidence shows that the parties manifested an intent to be bound by the March 9, 2020, agreement because KVK (1) provided OQSIE consultants laptops, physical access to KVK's facility, and scanned documents for remote consultants, (2) represented to the FDA that OQSIE was performing work for KVK, including work that OQSIE proposed in the March 9, 2020, proposal, and (3) representatives signed the document review and training protocols created by OQSIE.

ii.   **Sufficiently Definite Terms**

While the parties manifested an intent to be bound by the March 9, 2020, agreement, neither the terms of the email nor proposal were sufficiently definite to create a written contract.

An agreement is sufficiently definite if it "indicates that the parties intended to make a contract and if there is an appropriate basis upon which a court can fashion a remedy." ATACS Corp., 155 F.3d at 666.  When "there is no agreement or even a discussion as to *any* of the essential terms of an alleged bargain, such as time or manner of performance, or price or consideration, the 'agreement' is too indefinite for a party to *reasonably* believe that it could be enforceable in an action at law." Lackner v. Glosser, 892 A.2d 21, 31 (Pa. Super. Ct. 2006) (citing Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956)).

The time for performance was not sufficiently definite.  While the email included the time that the consultants would be deployed, March 16, 2020, it was vague as to the length of their deployment.  It stated that the attached plan was "for the next four weeks or so," however, the attached plan stated that the timing for Observations 1 and 3 were to be determined and that the objective was to complete Observation 2 in twelve months.  Exs. P-28, P-52.

The price was not sufficiently definite.  The email included the billing rates for the nine consultants to be deployed on March 16, 2020.  However, the rates for future consultants were only an estimate and a total budget was not provided.  Exs. P-28, P-51.

Lastly, the manner of performance for all activities was not sufficiently definite.  The email did not include a breakdown of the specific work to be completed by the consultants and the proposal indicated that several items were "to be determined" or still needed to be confirmed. For example, for Observation 2 there was a range in the number of consultants to be deployed,

predicated on unconfirmed assumptions.  Ex. P-51 at 7.  Similarly, the consultants needed to

complete Observations 1 and 3 were unconfirmed.  Ex. P-51 at 5, 8.  Likewise, the activities to

be completed for Observations 1 and 3, Step 3, were "to be determined."  Ex. P-51 at 7.  That is

not to say that none of the activities were sufficiently definite.  OQSIE did explain that its

consultant, Steven Lynn, would continue on an ad-hoc basis and included the job titles and roles

for the consultants to be deployed on March 16, 2020.  Exs. P-28, P-52.  Additionally, the

proposal included a comprehensive breakdown of the activities to be completed for Observations

1 and 3, steps 1 and 2, and for Observation 3, steps 1-3.  Ex. P-51 at 5, 6, 8.

As the terms of the March 9, 2020, agreement were not sufficiently definite, no written

contract was formed.

### C. Implied in fact contract.

While the terms of the March 9, 2020, agreement were not sufficiently definite to create a

written contract, this Court finds that as the parties' relationship continued, an implied-in-fact

contract was established.

An implied-in-fact contract "arises where the parties agree upon the obligations to be

incurred, but their intention, instead of being expressed in words, is inferred from acts in the light

of the surrounding circumstances."  Lisa & Marion, P.C. v. Recordex Acquisition Corp., 983

A.2d 652, 659 (Pa. 2009) (internal citations omitted).  As with written contracts, implied-in-fact

contracts require that the parties "agree upon the material and necessary details of the bargain"

and that "the agreement is supported by adequate consideration."  Univ. Atlantic Syst., Inc. v.

Honeywell Int'l, Inc., 388 F.Supp.3d 417, 428 (E.D. Pa. 2019) (Beetlestone) (internal citations

omitted).  Under Pennsylvania law, "a claim for breach of contract requires '(1) the existence of

a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3)

resultant damages.'" <u>Perlberger Law Assoc., P.C. v. Wells Fargo Bank, N.A.</u>, 552 F.Supp.3d 490,

498 (E.D. Pa. 2021) (McHugh) (quoting <u>CoreStates Bank, N.A. v. Cutillo</u>, 723 A.2d 1053, 1058

(Pa. Super. Ct. 1999)).  "The essential elements of breach of implied contract are the same as an

express contract, except the contract is implied through the parties' conduct, rather than expressly

written." <u>Id</u>. (internal quotations omitted).

Plaintiff showed, by a preponderance of the evidence, that an implied-in-fact contract

existed between the parties, that Defendant breached that contract, and that Plaintiff suffered

resultant damages.

**i.   Contract formation**

An implied-in-fact contract can be inferred from the parties continued engagement.

**a.  Manifestation of Intent.**

As already discussed, the parties clearly manifested an intent to be bound by the March 9,

2020, agreement.  Additionally, the parties' actions post-March 9, 2020, continued to manifest

their intent to be bound in a consultancy agreement.

OQSIE provided KVK with several additional proposals, estimates, and status updates

after March 9, 2020, and through the end of the relationship in mid-July 2020.  These

communications manifested the parties' intent to be bound by a consultancy agreement.  For

example, on April 17, 2020, Mr. Velez sent Mr. Tabasso a proposal to complete the next phase of

work.  In this email, Mr. Velez also addressed KVK's desire for a lower billing rate.  Ex. P-11.

Just five days later, on April 22, 2020, Mr. Velez emailed Mr. Tabasso regarding the governance

team meetings, training, data integrity, and document review findings.  To which Mr. Tabasso

informed Mr. Velez that KVK also had "some issue[s]" that it would like to discuss.  P-14.  The

following week on April 30, 2020, Mr. Velez addressed KVK's complaint regarding Program

Manager Steve Broadhead's work by offering a discount.  P-14.  Then on May 14, 2020, Mr.

Velez emailed Mr. Tabasso that OQSIE could not find a Master Services Agreement (MSA) and

that one should be executed because KVK represented to the FDA that such an agreement

existed, and that the FDA inspector may ask for it.  Mr. Tabasso responded that he would "look[]

into it."  Ex. P-67.

It is clear, even from just this sampling of communications, that the parties operated

under the framework of a contract in which KVK employed OQSIE to provide FDA consulting

services.  While it was by no means a perfect relationship, the fact that each party raised issues

and sought solutions, indicates that they understood themselves to be in a contractual

relationship.

This inference is further supported by the fact that KVK staff approved and signed

OQSIE created protocols regarding document review and training.  The protocols were signed by

OQSIE Human Resources Manager Jonathan Hunsberger, Director of Operations Lakshmi

Nammalvar, and Senior Quality Assurance Director Rama Eranki.  Exs. P-68, P-82.  At trial, Mr.

Velez testified that senior KVK officials likely approved and signed the protocols because they

were under the assumption that KVK and OQSIE had entered a consultancy agreement.  This

assumption would have been reasonable as consultancy agreements are standard in the industry.

Defendant's expert, Sarah Tanksley, even testified that her insurance requires a consultancy

agreement be executed before on-site consultants can be deployed.

The existence of a contract is also inferred from KVK's continued representations to the

FDA that it had "engaged" OQSIE.  KVK represented to the FDA in its March 4, 2020, response

to the Warning Letter and April 4, 2020, and June 15, 2020, updates that it had engaged OQSIE

to perform significant work pursuant to the FDA's recommendation that KVK enlist an independent third-party consultant.  Exs. P-2, P-30, P-110.

### b. Sufficiently Definite Terms

As the parties' relationship continued, the terms of the consultancy agreement became sufficiently definite as to form an implied-in-fact contract.

As discussed, an agreement is sufficiently definite if it "indicates that the parties intended to make a contract and if there is an appropriate basis upon which a court can fashion a remedy." ATACS Corp., 155 F.3d at 666.  Additionally, an agreement that omits an essential term "does not vitiate contract formation if the parties otherwise manifested their mutual assent to the agreement and the terms of the agreement are sufficiently definite."  Id. at 667.  While the timing and budget were not sufficiently definite in the March 9, 2020, agreement to constitute a contract, the terms became sufficiently definite over the course of the parties' relationship.

The budget became sufficiently definite because (1) a range in billing rates was included in the March 9, 2020, email, (2) as invoices were sent, KVK came to understand the individual consultants' rates and average weekly and monthly costs, (3) KVK was aware of OQSIE's billing rates and average costs because it complained to OQSIE about billing rates and total costs, (4) KVK approved the addition of all consultants by providing them with laptops, emails, and site or remote access,  (5) KVK regularly received, and until April 2020, timely paid, OQSIE invoices, and (6) KVK terminated OQSIE, in part, because of an OQSIE estimate that it would take sixty-seven (67) man years to complete the outstanding work.  KVK may not have been satisfied with OQSIE's billing rates, however, as the relationship continued, KVK was certainly aware of what those rates were and the overall cost of OQSIE's services.

11

The timing became sufficiently definite because (1) KVK received updates on the consultants' progress, particularly for Observation 2, that allowed it to track overall progress towards the FDA's observations, and (2) the parties discussed OQSIE's progress at weekly governance team meetings.  Further, both parties' experts testified that it is common when responding to FDA Warning Letters for the time needed to address issues to depend on what is found during the initial reviews and the number of consultants deployed.

### c. Consideration

There was adequate consideration.  "The test for consideration is 'whether the promisee, at the instance of the promisor, has suffered any detriment, or whether, in return for the promise, he has done something that he was not bound to do, or has promised to do some act, or has abstained from doing something.'"  Ohama v. Markowitz, 434 F.Supp.3d 303, 315 (E.D. Pa. 2020) (Baylson) (quoting Mikos v. Kida, 172 A. 101, 102 (Pa. 1934)).  "As long as 'the promisee has suffered [a] detriment, however slight, or ... has done what he was not otherwise bound to do [even though he has suffered no real detriment],' the contract is supported by valid consideration. Id. (quoting In re Commonwealth Tr. Co. of Pittsburgh, 54 A.2d 649, 652 (Pa. 1947)).  When OQSIE performed consulting services for KVK it did "what it was not otherwise bound to do."  Thus, the implied-in-fact contract is supported by consideration.

### ii. Breach

KVK breached.  Non-payment of invoices constitutes breach.  See Heil Trailer, d/b/a Kalyn Seibert v. XL Risk Consulting, Inc., 2021 WL 1163737 at * 2 (E.D. Pa. Mar. 26, 2021) (Marston) (holding that Defendant breached when it failed to pay Plaintiff's invoice).  KVK's refusal to pay OQSIE invoices for completed work was a breach of the implied-in-fact contract.

### iii.   Damages

OQSIE suffered damages.  Unpaid invoices constitute a "damage" sufficient to establish breach of contract.  See Eastern Elec. Corp. of New Jersey v. Shoemaker Const. Co., 657 F.Supp.2d 545, 555 (E.D. Pa. 2009) (Pratter) (Defendant "incurred damages in the amount of unpaid invoices.").  OQSIE's unpaid invoices are resultant damages stemming from KVK's breach.

### D. Equitable Remedies

This Court finds that Plaintiff showed by a preponderance of the evidence that Defendant was unjustly enriched (Count III).  This Court also finds that Plaintiff established a claim for promissory estoppel.

In coming to this conclusion, this Court relies on the following facts, established by Plaintiff at trial.  On February 17, 2024, the parties reached an initial agreement for $240,000 and six weeks of work.  Ex. P-3.  KVK paid OQSIE in full for the work completed as part of the initial agreement.  OQSIE continued to perform work for KVK, in part, because KVK was under pressure from the FDA.  In fact, KVK continuously represented to the FDA that it had engaged Plaintiff, starting with its March 4, 2020, Warning Letter response.  Ex. P-2.  The following month, in its April 4, 2020, update to the FDA, KVK reiterated that it had engaged OQSIE to help address the issues identified in the Warning Letter.  Ex. P-30.  OQSIE understood KVK's "engaged" language to mean that a consultancy services agreement existed between the parties, as evidenced Mr. Velez's May 14, 2020, email to Mr. Tabasso that OQSIE could not find the MSA and that one should be executed since KVK represented to the FDA that such an agreement existed.  Ex. P-67.

KVK continued to engage OQSIE and expected OQSIE to perform.  Through its words and

conduct, KVK made a promise to OQSIE that OQSIE relied on.  Relying on KVK's promise,

OQSIE continued to deploy consultants to work on KVK's project.  For example, on March 9,

2020, Mr. Velez sent Mr. Tabasso a proposal.  Mr. Velez testified that he believed that KVK

agreed to the proposal because (1) Mr. Tabasso responded to the email and said that the only

issue may be "seating," and (2) between March 9, 2020, and April 4, 2020, KVK onboarded

several OQSIE consultants, which included providing them with emails and access cards.  Exs.

P-51, 53.  Additionally, KVK represented to the FDA that OQSIE would develop training and

document review protocols.  Not only did OQSIE develop these protocols, but the protocols were

approved and signed by KVK representatives.  Exs. P-68, 82.  When it continued to provide its

staff and consultants, OQSIE had a legitimate expectation of being paid for its work.

Even after the parties' relationship ended, KVK benefitted from OQSIE's services.

Importantly, in its June 15, 2020, update KVK informed the FDA that "[i]n addition to already

onboarded consultants, KVK [was] *evaluating* additional third-party consultants."  Ex. P-110

(emphasis added).  Even after the parties' relationship terminated in July 2020, KVK represented

to the FDA in its September 15 and December 15, 2020, updates that "in addition to already

onboarded consultants, KVK *has added* additional third-party consultants."  Exs. P-116, P-119

(emphasis added).  This language suggested that OQSIE was still engaged by KVK.  KVK

benefitted from this suggestion because the FDA may not have been aware that KVK was

transitioning on a new team of consultants.  Further, KVK benefitted from on-the-job training

provided to its staff by OQSIE consultants.

### i.    Unjust Enrichment

These facts support a finding of unjust enrichment.

Unjust enrichment is an equitable action "which sounds in quasi-contract, a contract implied in law." Downey v. First Indem. Ins., 214 F.Supp.3d 414, 430 (E.D. Pa. 2016) (Goldberg) (quoting Sevast v. Kakouras, 915 A.2d 1147, 1153 n.7 (Pa. 2007)). Under Pennsylvania law unjust enrichment applies "only when the law implied a contract that requires the defendant to pay the value of the benefit conferred." Broederdorf v. Bacheler, 129 F.Supp.3d 182, 199 (E.D. Pa. 2015) (Dalzell). To recover under unjust enrichment a plaintiff must establish: "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation of such benefit(s) by the defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." Downey, 214 F.Supp.3d at 430.

In establishing a claim for unjust enrichment, it is insufficient to merely show that one party benefited from the acts of the other. Rather, there must be "an injustice in permitting the benefit to be retained without compensation." Downey, 214 F.Supp.3d at 430 (quoting Pender v. Susquehanna Twp., 933 A.2d 1085, 1094 (Pa. Commw. Ct. 2007)). To determine whether the doctrine applies, a court's focus "is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." Hollenshead v. New Penn Fin., LLC, 447 F.Supp.3d 283, 292 (E.D. Pa. 2020) (Goldberg) (quoting Durst v. Milroy Gen. Cont., Inc., 52 A.3d 357, 360 (Pa. Super. Ct. 2012)).

OQSIE conferred a benefit on Defendant when it provided FDA consulting services.

KVK appreciated this benefit. OQSIE's consulting services helped KVK comply with FDA regulations. Additionally, the FDA strongly encouraged KVK to retain an independent third party's expertise. Ex. P-1 at 3, 4, 5. KVK fulfilled this compliance request using OQSIE's services. KVK accepted OQSIE's services when it onboarded additional OQSIE consultants,

approved OQSIE plans, and at weekly governance team meetings where it discussed the project with OQSIE.

KVK retained the benefit of OQSIE's services because progress was made on the FDA's observations and KVK's employees received on-the-job training from OQSIE's consultants.

As such, the elements of unjust enrichment are met.

### ii.   Promissory Estoppel

These facts also support a finding of promissory estoppel.

Promissory estoppel is a form of equitable relief, "invoked to avoid injustice by making enforceable a promise made by one party to the other when the promisee relies on the promise and therefore changes his position to his own detriment."  Crouse v. Cyclops Industries, 745 A.2d 606, 610 (Pa. 2000).  Promissory estoppel allows courts to enforce a party's promise absent consideration.  Gentex Corp. v. Superior Mold Co., 2020 WL 7711390 at *2 (E.D. Pa. Dec. 29, 2020) (Bartle) (citing Carlson v. Arnot-Ogden Mem'l Hosp., 918 F.2d 411, 416 (3d Cir. 1990)). To establish a claim for promissory estoppel the promissee must show that, "1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise."  Id.

KVK made a promise that it should have reasonably expected to induce action on the part of OQSIE.  KVK promised OQSIE that it would pay for OQSIE's services when it approved and onboarded OQSIE's consultants.

16

OQSIE acted in reliance on KVK's promise to pay.  OQSIE would not have continued to deploy consultants to work on KVK's project if KVK had not promised to pay for OQSIE's services.

Injustice can only be avoided by enforcing the promise and requiring KVK to pay for OQSIE's services.  It is unjust that KVK would retain the benefit of OQSIE's consulting services without providing OQSIE payment.

## IV.    CONCLUSION

For the aforementioned reasons, this Court finds that Plaintiff has established, by a preponderance of the evidence, breach of an implied-in-fact contract or the equitable remedy of unjust enrichment or promissory estoppel.  This Court notes that Plaintiff may only recover damages under breach or an equitable remedy, but not both.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 20\20-5553 Velez v KVK-Tech\20-5553 Velez v. KVK Trial Memo Opinion final.docx